Robert W. KEARNS, Plaintiff,

v.

FRED LAVERY/PORSCHE AUDI CO., Wood Motors, Inc., Volkswagenwerk A.G., and Audi NSU Auto Union, A.G., Defendants.

Civ. A. No. 82–70749.

United States District Court, E.D. Michigan, S.D.

Oct. 20, 1983.

McDougall, Hersh & Scott by Keith V. Rockey, Chicago, Ill., for plaintiff.

Lalos, Leeds, Keegan, Lett & Marsh by James H. Marsh, Jr., Washington, D.C., for defendants.

OPINION DISQUALIFYING COUNSEL

GILMORE, District Judge.

This matter is before the Court upon a motion by plaintiff to disqualify Peter Lalos and his law firm, Lalos, Leeds, Keegan, Lett & Marsh, from representing defendants in this patent suit.

I

Prior to the institution of this action, plaintiff Kearns had filed suits against various automobile manufacturers for infringement of his U.S. patents on intermittent windshield wipers. In one case, Ford Motor Company was a defendant, and Richard Aitken of Washington, D.C. represented plaintiff.

Aitken was forced to withdraw from representing Kearns in December of 1980 for reasons not relevant to this matter. Thereafter, in March of 1981, Kearns approached Lalos to ascertain whether he would represent him in litigation against Ford, succeeding Aitken.

At their first meeting, on March 13, Kearns told Lalos that Audi was a potential defendant in another patent suit on the same patents, and Lalos advised Kearns that he had, and did, represent Audi on patent matters, although he had not yet been retained to represent Audi in this case.

After that, the stories of the parties differ greatly, and one full afternoon was dedicated by the Court to the testimony of Kearns and Lalos.

Kearns testified that he had long discussions with Lalos about the Ford case, seeking to retain Lalos to represent him. The Court finds as a matter of fact that Lalos said to Kearns that he might be able to represent him in the pending litigation against Ford, if there could be a satisfacto-

ry settlement of the Audi case.[1] The Court further finds that Kearns believed that Lalos seriously considered representing him, and that, from the period of approximately March 13 until April 8, 1981, Kearns and Lalos discussed Lalos' representation of Kearns. In these discussions, they went into the facts of the case, both public and confidential, in great detail.

Several days after the initial conference, Kearns delivered to Lalos all of the documents in the Ford case that he had obtained from Aitken. These documents contained, among other things, handwritten notes of Aitken, and confidential and public records.

Lalos called Aitken thereafter and talked with him about the case. He testified that he talked to him only about public matters, but Aitken submitted an affidavit stating: "I believe I discussed various issues, and Kearns' position in respect to those issues, in some depth with Mr. Lalos because of Mr. Kearns' interest in securing Mr. Lalos' representation." The Court finds that matters related to the Ford litigation, other than those of public record, were discussed between Lalos and Aitken.

Timothy Kearns, Kearns' son, filed an affidavit in which he said: "I accompanied my father on four of his visits to Mr. Lalos. I heard Mr. Lalos tell my father that he would consider representing my father in that litigation. As a result, my father conducted, in my presence, detailed discussions with Mr. Lalos regarding the merits of the litigation."

Included in the discussions was a request by Kearns that Lalos undertake the representation on a contingency basis. Lalos said this was a matter that would have to be taken up with his partners. The Court finds that Lalos had such discussions with his partners, and they turned down the contingency arrangement. This is borne out by the handwritten notes of Kearns, Exhibit 1, dated April 8, 1981, which said, on the bottom of Page 1: "Honest differences of opinion—merits—if parties can't have consensus. Negative about contin-

gency." It is also borne out by Exhibit 2, Kearns' memo to his own negotiation file, dated April 13, 1981, which said: "Peter Lalos declined to take the case on contingency. Partners said the case was 'not a sure thing' because of 'on sale' & 'fraud' allegations."

These negotiations for representation broke down in the second week of April, 1981, after Lalos decided he could not take the case on a contingency basis. The parties then started to negotiate a settlement of the Audi matter. Suit had not yet been started, and was not started for approximately a year, but a notice of infringement had been sent by Kearns to Audi in January of 1981, and Audi authorized Lalos to negotiate with Kearns to settle the matter.

At that time, Lalos knew that Kearns had an attorney, one Bill Hall, who had undertaken the representation of Kearns against Ford on April 9, 1981, after Lalos had turned down Kearns.

Approximately a month to two months later, Keith Rockey, who now represents Kearns, came into the case. Lalos testified that some time in May or June he learned that Rockey was Kearns' attorney. Yet, throughout all of this time after the breakdown of the negotiations for the retention of Lalos as counsel, Lalos negotiated with Kearns alone for the settlement of the Audi matter, knowing full well that Kearns had counsel. Lalos testified he saw no problem in that, because Hall and Rockey were going to represent Kearns in the Ford matter, and he felt then it was all right for him to negotiate on the Audi matter.

The fact remains, however, that the Audi and the Ford cases were so closely tied together that it is difficult to separate them. Both involve suits by Kearns for infringement of the same patents for intermittent windshield wipers.

## II

There is no question that between March 13 and April 8, 1981 a lawyer-client rela-

---

**1.** In fact, Lalos stated the same thing in his pre-hearing affidavit.

tionship existed between Lalos and Kearns. Even though representation was not eventually undertaken by Lalos, Kearns was a client within the meaning of the attorney-client privilege.

■ The attorney-client privilege attaches, and one is considered a client, whenever one consults a lawyer with a view to obtaining professional legal services. Rule 502(a)(1) of the Uniform Rules of Evidence, 1974 Edition, accurately defines a client as a "... person ... who consults a lawyer with a view to obtaining professional legal services from him."

McCormick on Evidence, 2d Ed. (West Publishing Co., 1972) § 88, p. 179 states, in discussing the professional relationship and the privilege: "Communications in the course of preliminary discussions with a view to employing the lawyer are privileged though the employment is in the upshot not accepted."

In *Westinghouse Electric Corp. v. Kerr-McGee*, 580 F.2d 1311 (7th Cir.1978), the court stated:

The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer although actual employment does not result.... The professional relationship for purposes of the privilege for attorney-client communication hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice.

*Id.* at 1319.

It is therefore clear that the attorney-client privilege attached at the time Kearns consulted Lalos about undertaking the case, and continued throughout their discussions until Lalos decided in the second week of April, 1981 that he would not take the case. Lalos therefore was in a fiduciary relationship with Dr. Kearns throughout these discussions.

Recognizing that a fiduciary relationship existed, the Court must examine the consequences of that relationship upon the sub-

sequent representation by Lalos and his law firm of the defendants in this proceeding.

A most significant case on the subject is *Trone v. Smith*, 621 F.2d 994 (9th Cir. 1980). The Court stated there:

"Perhaps the most important facet of the professional relationship served by this rule of disqualification is the preservation of secrets and confidences communicated to the lawyer by the client. If there is a reasonable probability that confidences were disclosed which could be used against the client in later, adverse representation, a substantial relation between the two cases is presumed....

Both the lawyer and the client should expect that the lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client and in undertaking representation on the client's behalf. That professional commitment is not furthered, but endangered, if the possibility exists that the lawyer will change sides later in a substantially related matter....

. . . . .

As we have stated, the underlying concern is the possibility, or appearance of the possibility, that the attorney may have received confidential information during the prior representation that would be relevant to the subsequent matter in which disqualification is sought. The test does not require the former client to show that actual confidences were disclosed. That inquiry would be improper as requiring the very disclosure the rule is intended to protect....

Once the attorney is found to be disqualified, both the attorney and the attorney's firm are disqualified from suing the former client....

*Id.* at 998, 999.

In *General Electric v. Valeron & Co.*, 608 F.2d 265 (6th Cir.1979) the court held that a showing of a substantial relationship between an attorney's prior work for a

party and the instant litigation and the receipt of confidential information is sufficient for disqualification. "... Proof of such a substantial relation is generally sufficient to require disqualification..." *Id.* at 267.

In another Sixth Circuit case, *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290 (6th Cir.1979), the court said:

It has been repeatedly held that an attorney may not represent a client in litigation against a former client if the subject matter of the litigation is "substantially related" to work he or she did for the former client....

*Id.* at 292.

And in *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d 706 (7th Cir.1979), it was held:

The basic policies underlying any judicially-compelled withdrawal of counsel because of a potential conflict of interest can be found in Canons 4 and 9 of the ABA Code of Professional Responsibility.... Read together, the two cannons indicate that an attorney *may* be required to withdraw from a case where there exists even an appearance of a conflict of interest.

.    .    .    .    .

We begin with the well-settled rule that where an attorney represents a party in a matter in which the adverse party is that attorney's former client, the attorney will be disqualified if the subject matter of the two representations are "substantially related." The court, in these circumstances, makes no inquiry into whether confidential information relating to the matter involved in the subsequent representation did in fact pass to the attorney during the course of the former representation; his possession of such information will be presumed....

*Id.* at 709, 710.

In *Westinghouse Electric Corporation v. Gulf Oil Corporation*, 588 F.2d 221 (5th Cir.1978), the court stated:

The substantial relationship rule embodies the substance of Canons 4 and 9

of the A.B.A. Code of Professional Responsibility.... As a result it is clear that the determination of whether there is a substantial relationship turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is sought. The rule thus does not necessarily involve any inquiry into the imponderables involved in the degree of relationship between the two matters but instead involves a realistic appraisal of the *possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other.* The effect of the Canons is necessarily to restrict the inquiry to the possibility of disclosure; ...

The evidence need only establish the scope of the legal representation and not the actual receipt of the allegedly relevant confidential information. Then only where it is clearly discernible, "that the issues involved in a current case do not relate to matters in which the attorney formerly represented the adverse party will the attorney's present representation be treated as measuring up to the standard of legal ethics." .... (emphasis added).

*Id.* at 224.

■ It therefore becomes clear that Lalos is disqualified from further representation of the defendants in this case because he received confidential information concerning a case which is substantially related to the instant case. For him to continue his representation would involve a breach of his fiduciary obligations and would undermine the integrity of the attorney-client privilege and Canons 4, 5 and 9 of the Code of Professional Responsibility.

■ Additionally, Lalos was guilty of a breach of professional standards by continuing to negotiate with Kearns after he was well aware that Kearns was represented by other lawyers. The fact that he was negotiating on the Audi matter rather than the Ford matter is irrelevant. Disciplinary Rule 7–104 of the Code of Professional

Responsibility clearly proscribes negotiations by any lawyer with another person who is represented by counsel without first obtaining the permission of that person's lawyer.

Moreover, permitting Lalos to continue as counsel for the defendant in the instant case would violate Canon 9 of the Code of Professional Responsibility, which states: "A lawyer should avoid even the appearance of professional impropriety." Ethical Consideration 9–6 mandates that every lawyer "... conduct himself so as to reflect credit upon the legal profession and to inspire the confidence, respect and trust of his clients and of the public; and to strive to avoid not only professional impropriety but also the appearance of impropriety."

 Having disqualified Lalos, the Court must also disqualify the law firm of Lalos, Leeds, Keegan, Lett & Marsh. Confidences and secrets possessed by an attorney are presumptively possessed by other members of his firm. *See Trone v. Smith, supra,* at 999; *Westinghouse Electric Corporation v. Kerr-McGee Corporation, supra,* at 1318; *Schloette v. Railoc of Indiana, Inc., supra,* at 710; and DR 5–105(D) of the Code of Professional Responsibility.[2]

Disqualification of counsel in this case does not unduly prejudice defendant, as defendant has ample time and resources to retain new counsel and prepare for trial, which is scheduled for late spring of 1984. Additional time can be granted for good cause shown.

*Redd v. Shell Oil Company,* 518 F.2d 311, at 315 (10th Cir.1975), cited by defendant, is distinguishable because the motion for disqualification in that case was brought on the Friday preceding a Monday trial date. *Trust Corporation of Montana v. Piper Aircraft Corporation,* 701 F.2d 85, at 86–87 (9th Cir.1983), is also distinguishable because the motion for disqualification in that case was brought just 33 days prior to trial.

2. The ABA Code of Professional Responsibility has been adopted as the Code of Professional Responsibility for lawyers practicing in the

Finally, although plaintiff waited 18 months between the time the instant complaint was filed in March, 1982 and the time the motion for disqualification was filed in August, 1983, counsel for plaintiff did correspond with defense counsel seeking an explanation of the confidential information Lalos may have obtained. Further, the disqualification motion was brought relatively promptly after settlement negotiations broke down.

Counsel shall present an order embodying the findings of this opinion disqualifying Lalos and the law firm of Lalos, Leeds, Keegan, Lett & Marsh. The order shall provide that defendants obtain other counsel within 90 days of the date of the order.

United States District Court for the Eastern District of Michigan.