James F. DALRYMPLE, Plaintiff,

v.

NATIONAL BANK AND TRUST COMPANY OF TRAVERSE CITY, et al., Defendants.

Joel R. GAFF, et al., Plaintiffs,

v.

NATIONAL BANK & TRUST COMPANY OF TRAVERSE CITY, et al., Defendants.

MACCABEES MUTUAL LIFE INSURANCE COMPANY, Plaintiff,

v.

David E. PEARCE, et al., Defendants.

Nos. G81–709 CA7, G81–866 CA7 and G85–103 CA7.

United States District Court, W.D. Michigan, S.D.

Aug. 8, 1985.

Stuart D. Hubbel, Traverse City, Mich., J. Bruce Donaldson, Bloomfield Hills, Mich., and Dirk J. Holkeboer, Kalamazoo, Mich., for plaintiffs.

Larry C. Willey, Grand Rapids, Mich., Stephen Novack, Chicago, Ill., for intervening plaintiff, FDIC.

Richard Rossman, Lawrence Campbell, Detroit, Mich., John W. Allen, Kalamazoo, Mich., Gordon J. Quist, Richard J. Quist, Grand Rapids, Mich., Jeffrey J. McManus, Michael J. Lemcool, Traverse City, Mich., John C. Jones, Grand Rapids, Mich., Stephen C. Chambers, Traverse City, Mich., William S. Farr, Grand Rapids, Mich., Stanley E. Burke, Elk Rapids, Mich., Harold E. Nelson, Grand Rapids, Mich., and Lawrence G. Campbell, Detroit, Mich., for defendants.

## OPINION ON MOTIONS TO DISQUALIFY

MILES, Chief Judge.

Now before the Court are motions by the defendant directors (Purvis, Stulen, Comstock, Kellogg, Green, Schmuckal, Lindsay, Underwood, Carlson & Bay) to disqualify counsel for the FDIC, Novak & Macey, and to disqualify co-counsel for the plaintiff-shareholders, J. Bruce Donaldson.

In 1981, plaintiff Dalrymple filed a derivative action in the Grand Traverse County Circuit Court. On September 1, 1981, the Board of Directors of the National Bank & Trust Company of Traverse City (NBT) formed a Special Litigation Committee, comprised of directors Lindsay, Stulen and Comstock, to investigate the allegations of the complaint. The Committee retained the law firm of Baxter & Hammond to act as legal counsel to the Committee. Attorney Robert Hammond advised and assisted the Committee in its investigation and helped draft the report of the Committee's findings, which was submitted to the full Board on January 8, 1982.

The Committee was also charged with investigating the allegations of a derivative action filed in 1981 by plaintiff Gaff, also in the Grand Traverse County Circuit Court. The actions by Dalrymple and Gaff were subsequently consolidated in July, 1983 by the Hon. William Brown. The Committee, again assisted by attorney Hammond, reported its findings and conclusions in a report supplementing the report previously filed with respect to the Dalrymple action.

Both actions were found to be without merit by the Special Litigation Committee, which recommended that the full Board take action to have the cases dismissed.

On September 1, 1983, J. Bruce Donaldson became a partner in the law firm of Dykema, Gossett, Spencer, Goodnow & Trigg. At all times after his entry into the firm, until the FDIC filed its Second Amended Complaint on February 11, 1985, he has continued to represent Dalrymple in the prosecution of the present action. In August, 1984, certain partners of Baxter & Hammond—including Richard Baxter and Robert Hammond—became partners of the firm of Dykema, Gossett. At no time has Dykema, Gossett represented either NBT or any of those directors seeking disqualification of J. Bruce Donaldson as counsel for Dalrymple in the present action.

In early 1984, the Dalrymple litigation was greatly expended by the filing of the Amended and Supplemental Consolidated Complaint. In response to the new complaint, the Board of Directors of NBT appointed a second Special Litigation Committee, comprised of directors Steckley, Wagner, and Nixon, to investigate the new claims. This Committee retained the firm of Levy & Erens, of Chicago, to assist its investigation. Stephen Novack and Eric Macey were partners in that firm. On February 9, 1984 the firm sent a letter to the Board confirming its retention for purposes of investigating the claims in the newly-filed complaint. Novack and/or Macey attended at least one board meeting, on February 21, 1984. At this time, defendants allege that Novack and/or Macey stated that, on the basis of the investigation that they had theretofore conducted, there was no basis to the claims of mismanage-

ment, and that the Dalrymple-Gaff allegations were unfounded. On March 9, 1984, the Bank failed. Thus, the association of attorneys Novack and Macey, for the firm of Levy & Erens, with the bank, lasted approximately one month, from February to March, 1984.

Later, Novack and Macey left the firm of Levy & Erens to form their own firm, "Novack & Macey". They are now representing the FDIC in its claims on behalf of the failed bank against the former officers and directors.

### Motion to Disqualify Novack & Macey

Because of the investigation undertaken by attorneys Novack and Macey during their one-month retention by the Board of Directors, and because of the alleged statement they had found no wrongdoing on the part of the directors, defendants claim that the two attorneys will be "necessary witnesses" in this case. In fact, defendants claim that Novack's and Macey's testimony will be "crucial" (Brief in support of Motion to Disqualify, p 6).

Alternatively, defendants claim that Novack & Macey must be disqualified because of a conflict of interest between their present representation of the FDIC against the officers & directors, and their former investigation on behalf of the Bank at the instance of the Board of Directors.

Although the parties conceive that the first of the two issues is the more critical, the Court believes that the spectre of a conflict of interest between Novack & Macey's previous and present representation poses the greater cause for concern.

■ In determining whether an attorney-client relationship has been created, the focus is on the putative client's subjective belief that he is consulting a lawyer in his professional capacity, and on his intent to seek professional legal advice. *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir.1978). Although no Sixth Circuit case has spoken to this issue, the Westinghouse standard was adopted by Judge Gilmore in *Kearns v. Fred Lavery*

*Porsche/Audi Co.*, 573 F.Supp. 91 (E.D. Mich.1983), *aff'd* 745 F.2d 600 (Fed.Cir. 1985), *cert. denied,* —— U.S. —— 105 S.Ct. 967, 83 L.Ed.2d 971 (1985). Novack and Macey claim that it was clear to all involved that their representation was engaged exclusively on behalf of the bank, and that they never purported to represent any director or officer in his individual capacity. However, because affidavits submitted by directors Green, Underwood, and Carlson in support of the motion to disqualify tended to establish that they believed Novack and Macey were retained, at least in part, to exonerate them from any individual wrongdoing, the Court determined that an evidentiary hearing was necessary to evaluate the conflicting factual assertions and issues of credibility. *General Mill Supply Co. v. SCA Services Inc.*, 697 F.2d 704 (6th Cir.1982).

Rule 1.9 of the Model Rules of Professional Conduct provides, in part:

A lawyer who has formerly represented a client in a matter shall not thereafter: (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

Although few cases construe the recently-approved Model Rules, which, as of August 2, 1983, supplant the ABA Code of Professional Responsibility, the Court believes it not inappropriate to turn for guidance to the extant body of law.

■ To disqualify counsel on the basis of a conflict of interest between former and present clients, it is first necessary to show that an attorney-client relationship exists or has existed between counsel and the movant. *American Can Co. v. Citrus Feed Co.*, 436 F.2d 1125, 1129 (5th Cir. 1971); *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 90 (5th Cir. 1976). This requirement has been questioned where, for example, in the absence of a "strict contractual attorney-client relationship", an attorney's current representation is adverse to parties whose liability is

"inextricably intertwined" with a co-defendant and former client of the attorney whose disqualification is sought. *Trone v. Smith*, 621 F.2d 994, 1001–1002 (9th Cir. 1980); and, of course, where an individual reasonably believes an attorney-client relationship has been created, *Westinghouse Electric Corp. v. Kerr-McGee Corp., supra; Kearns v. Fred Lavery/Porsche-Audi Co., supra.* Foremost among the underlying concerns is the possibility of the attorney's disloyalty and breach of faith towards one who had previously entrusted him with confidences.

In this case, the Court believes the essential inquiry must be how the defendant-directors perceived their relationship with attorneys Novack and Macey. In the absence of a confidential relationship between counsel and the movant-defendants, there can be no breach of faith requiring disqualification.

■ The documentary evidence leaves no doubt that Levy & Erens were retained to represent the Bank *exclusively*; indeed, the scope of Levy & Erens' charge was to investigate potential claims against former *and* present directors. The directors were advised to seek their own, separate counsel. (Joint Ex. A, Items 2, 3, 4, 9). Attorney fees were paid by NBT, not by or for the directors. (Carlson Aff., ¶ 3; Green Aff. ¶ 3). It was explicitly understood by *all* the directors that attorneys Novack and Macey were investigating claims of wrongdoing against them individually, and that Novack and Macey were not representing them in their individual capacities. As Dr. Wagener stated in his deposition, pp. 5–6:

Okay. The directors that were present were aware of the fact that this committee was charged with investigating the possibility of claims, even against them individually, or of the finding of no claims against them individually. It was a two-way street, and they all knew that. In my opinion, they knew that.

\*    \*    \*    \*    \*    \*

*We were told by the bank's attorney at that time that we could become adversaries, Levy & Erens could become ad-versaries of each of us and if we needed counsel down the road, we should hire our own counsel. That's about as specific as you can get.*

(Emphasis added).

And, as Mr. Bay stated in his deposition, p. 19,

Q. So you understood that the marching order, so to speak, of this independent committee was to literally investigate you, as well as all other sitting directors.

A. That's right.

Q. You were what is commonly referred to as a target; is that correct?

A. Well, we were included in the investigation, yes.

Each hearing witness, *without exception*, testified that Levy & Erens did not represent any director in his or her individual capacity.

These facts starkly demonstrate that no attorney-client relationship has ever arisen between Messrs. Novack and Macey and the defendants, nor can a fiduciary relationship of loyalty and trust reasonably be inferred from the attorneys' contacts with the directors. At all times, Novack and Macey were acting on behalf of their sole client, NBT, and at all time the directors understood that they were "targets" and "potential adversaries" of the attorneys. Therefore, Rule 1.9 is not violated by Novack & Macey's present representation on behalf of NBT against its former officers and directors.

■ The Court further agrees with counsel that Rule 3.7 of the Model Rules does not require their disqualification. That rule prohibits an attorney from acting as an advocate in a case in which he is likely to be a "necessary witness." First, the Court finds that the "alleged statement" was never made. (Tr. pp. 58, 68, 90, 103–04, 123) Second, even if the statement were made, it is clear that testimony from Novack and Macey regarding their brief, aborted investigation will not be "crucial" or "necessary" as the Rule contemplates.

The motion to disqualify Novack & Macey is DENIED.

### Motion to Disqualify J. Bruce Donaldson

The motion to disqualify Mr. Donaldson raises considerably more difficult factual and legal issues.

The members of the first Special Litigation Committee, Lindsay, Comstock and Stulen, at all times understood that their explicit charge was to investigate Dalrymple's allegations of wrongdoing on the part of NBT's officers and directors.[1] The directors knew that they were the targets of the investigation, and that facts indicating individual misconduct would be included in the report. The report itself was not intended to be confidential; if, as the principals hoped, the report exonerated them, it would provide the foundation for a motion to dismiss. Such a motion to dismiss was in fact filed in the Grand Traverse County Circuit Court, for which the Committee's report was an exhibit.

The Court specifically finds that the members of the Committee, and the remaining directors, had no expectation of confidentiality with respect to their contacts with attorney Hammond.. The directors knew that he was representing *the Bank*; that he was assisting them to investigate and ferret out *their own* possible acts of misconduct; that any such wrongdoing, once discovered, would be disclosed to the full Board; and that their own position vis-a-vis the Bank as joint defendants or adversaries had not yet been determined, pending the outcome of the investigation.

Contrary to defendants' assertion (Reply to Brief in Opposition to Motion to Disqualify and Enjoin Counsel, p. 5, pldg. 362), neither the members of the Special Litigation Committee nor the other directors had any belief, reasonable or otherwise, that Attorney Hammond was acting as his or her personal attorney. It was understood at all times that Hammond represented the Bank exclusively.

The report of the first Committee concluded that the allegations of Dalrymple's complaint were meritless, and recommended that the full Board seek to have the complaint dismissed. Although a motion to dismiss was filed, it was never ruled on. Thus, the *Dalrymple* and *Gaff* actions continued.

On March 9, 1984, NBT was closed by the Comptroller of the Currency. Its assets were sold to the FDIC, which also acts as NBT's receiver. On February 11, 1985, the FDIC on behalf of NBT, filed suit against many of NBT's former officers and directors.

By order of this Court on February 11, 1985 the derivative counts of the *Dalrymple-Gaff* amended and supplemental consolidated complaint were stayed. The FDIC, as NBT's receiver, is solely responsible, in the absence of defalcation,[2] for the prosecution of claims owned by the corporate entity, NBT. However, the shareholders were allowed to engage in simultaneous pre-trial proceedings with the FDIC, with respect to the shareholders' Amended Count V; this count purports to state a direct cause of action owned by the shareholders in their individual capacities. Amended Count V incorporates many of the derivative allegations of the amended and supplemental consolidated complaint.

The pertinent provisions of the Model Rules of Professional Conduct are:

Rule 1.10 Imputed Disqualification: General Rule

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them

---

**1.** Although only Pearce and Mann were named as defendants by the *Dalrymple* complaint, references to "unnamed" directors and officers left no doubt in the minds of such "unnamed" directors that they were potential defendants.

**2.** The Court previously recognized that the shareholders might have a right to pursue derivative claims upon a showing of dereliction by the FDIC. See, *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139 (3d Cir.1983). (2–11–85 Hearing Tr. pp. 6–7). No such showing has been made.

practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

■ In determining whether disqualification of counsel on grounds of conflict of interest is required, the Court must be sensitive to two overriding interests—preservation of the integrity of the adversary process; and solicitousness for a client's right to be represented by counsel of his choice. *Evans v. Artek Systems Corp.*, 715 F.2d 788 (2d Cir.1983). The Court must also be sensitive to tactical considerations which may impel a party to seek disqualification of a particularly competent or formidable opponent.

The crux of defendants' argument is that Hammond, if practicing alone, would be prohibited by Rule 1.9 from suing NBT's former directors in this case on behalf of Dalrymple, and that Donaldson is therefore imputedly disqualified by Rule 1.10(a). Donaldson, on the other hand, contends that Rule 1.10(b) controls this situation. The Court agrees.

The comment to Rule 1.10 provides:
Principles of Imputed Disqualification
The rule of imputed disqualification stated in paragraph (a) gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm. Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated. Paragraph (a) operates only among the lawyers currently associated in a firm. *When a lawyer moves from one firm to another, the situation is governed by paragraphs (b) and (c).*

(Emphasis added). As subparagraph (b) specifically treats the problem of former clients of an attorney who joins a firm, it, not subparagraph (a), governs.

The Sixth Circuit's test for disqualification under the now-superseded Code of Professional Responsibility prohibited an attorney from representing a client against a former client if the former and current representations were both "adverse" and "substantially related." *General Electric Co. v. Valeron Corp.*, 608 F.2d 265, 267 (6th Cir.1979), *cert. denied,* 445 U.S. 930, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290, 292 (6th Cir.1979). These criteria have been incorporated into the current MRPC. There is no question that the prior representation—Hammond's services to NBT—relates to the same matter as the current representation now at issue—Donaldson's representation of the shareholders.

■ It has frequently been stated that an attorney "may not serve the corporation in a particular matter and then represent a plaintiff a suit against it or its officers in a substantially-related matter." *Evans v. Artek Systems Corp., supra* at 792; *Trone v. Smith,* 621 F.2d 994 (9th Cir.1980); Note, *Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 Harv.L. Rev. 1244, 1345 (1981). The rational for this rule has been enunciated as resting upon the rather fluid, protean nature of the corporate attorney's relationship to his "client," which, at one time may be the corporation itself, and, at another time, may be management. Note, *supra,* 94 Harv.L.Rev. at 1345. In such cases, the courts have disqualified from subsequent adverse representation former corporate attorneys who have been in a position to receive confidential information about the corporation or its officers and directors, regardless of whether confidences were actually imparted. *Trone v. Smith, supra; Richardson v. Hamilton,* 469 F.2d 1382 (3d Cir.1972),

*aff'g.,* 333 F.Supp. 1049 (E.D.Pa.1971); *Chugach v. United States District Court for the District of Alaska,* 370 F.2d 441 (9th Cir.1967); *Cannon v. U.S. Acoustics Corp.,* 398 F.Supp. 209 (N.D.Ill.1975). The inquiry in such cases is whether the attorney was in a position to acquire confidences of his client; the actual receipt of such confidential information is irrelevant. *Cannon v. U.S. Acoustics Rop., supra* at 223; *Trone v. Smith, supra* at 998.

■ As previously noted, it is not even necessary that a strict contractual attorney-client relationship exist. An implied attorney-client relationship exists whenever the lay party submits confidential information to an attorney whom he reasonably believes is acting to further his interests. *Westinghouse Electric Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311 (7th Cir.1978); *International Paper Co. v. Lloyd Mfg. Co.,* 555 F.Supp. 125 (N.D.Ill.1982); *Kearns v. Fred-Lavery/Porsche Audi Co.,* 573 F.Supp. 91 (E.D.Mich.1983), *aff'd,* 745 F.2d 600 (Fed.Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 967, 83 L.Ed.2d 971 (1985).

It is also clear that, absent either an express or implied attorney-client relationship, the prohibitions against subsequent representation adverse to a former "client" are not implicated. There must, as a threshold matter, first be an attorney-client relationship, for the strictures to come into play. *Trone v. Smith, supra,* (attorney had formerly represented corporate officer *personally* in substantially related matter); *International Paper Co. v. Lloyd Mfg. Co., supra* at 132 ("no evidence that Velsicol entertained a belief, reasonable or otherwise, that Wildman represented Velsicol . . ."); *Westinghouse Electric Corp. v. Kerr-McGee Corp., supra* at 1321 ("[the companies] each entertained a reasonable belief that it was submitting confidential information . . . to a law firm which had solicited the information upon a representation that the firm was acting in the undivided interest of each company."); *Kearns v. Fred Lavery/Porsche Audi Co., supra* at

95 (attorney received confidential information from prospective client during preliminary consultations); *Glover v. Libman,* 578 F.Supp. 748, 757 (N.D.Ga.1983) ("Our understanding . . . was Joe Manning was our attorney, representing us as co-owners of the program"); *Wayland v. Shore Lobster & Shrimp Corp.,* 537 F.Supp. 1220, 1223 (S.D.N.Y.1982) (". . . Wayland could not have reasonably believed or expected that any information given to the firm would be kept confidential from the other shareholders or from the corporation as an entity."); *U.S. Industries, Inc. v. Goldman,* 421 F.Supp. 7, 11 (S.D.N.Y.1976) (". . . no factual allegations that PB & W has obtained or will utilize information obtained in confidence from defendant").

The role of the Special Litigation Committee is anomalous, as it involves an ostensibly independent investigation by directors of their colleagues' and their own, misconduct, assisted by an attorney selected precisely because he had no previous professional relationship with either the corporate entity or its directors. Problems of conflicting loyalties in connection with previous transactions and advice given to the corporation and its managers do not, therefore, arise. *Contrast,* Note, *supra,* 94 Harv.L.Rev. at 1345.

In such a case, the expectation of confidentiality or lack thereof, reposed by the directors in the attorney charged with assisting them in conducting a thorough, unbiased, complete investigation becomes paramount. Defendants' contentions that they "had no understanding that their interests were not congruent with the Bank's" (Reply to Brief in Opposition to Motion to Disqualify and Enjoin Counsel, p. 6) and that they believed that Hammond "was on their side of the litigation" (Brief, p. 5), are not substantiated by the evidence. Stulen testified that he "absolutely" expected any adverse information about himself or any other director to be disclosed in the report, "wherever the chips fell" (7–5–85 Hearing Tr., Tr. pp. 107–108), that he was investigating his own conduct (Tr. pp. 111–112), that he understood that he and

other directors were potential defendants (Tr. p. 111), that he and the other members of the Special Litigation Committee kept "an open mind to see whether there was anything that might trigger a [red] flag", *regardless of whether the potential misconduct had been alleged in the Dalrymple and Gaff complaints* (Tr. p. 121), that he and the other committee members would "have gone back and looked to see if [they] ... missed something" (Tr. p. 122). Stulen also testified that committee members were acutely aware "that we might have to be on the stand to support our work, and so consequently we did the best job we could." (Tr. pp. 76–97).

■ The documentary evidence establishes that, at the time of the creation of the Special Litigation Committee, NBT had not yet determined the position it should take with respect to the *Dalrymple* and *Gaff* matters, and that Hammond was chosen because of his "complete independence":

WHEREAS, the Board of Directors on September 1, 1981, established the Special Litigation Committee for the purpose of investigating wrongdoings alleged to have been committed by officers and/or directors of the Bank in the matter of *Dalrymple v. National Bank and Trust Company of Traverse City, et al.* and *to determine the position that the Bank shall take with respect to that litigation and/or with respect to officers and/or directors alleged to have committed such wrongdoings;* and

WHEREAS, the Special Litigation Committee retained Baxter & Hammond of Grand Rapids, Michigan, as independent legal counsel, having determined that the law firm has had no prior affiliation or

connection with the Bank, its officers or directors and *is completely independent;*

(Def. Exhibit C) (Emphasis added).

WHEREAS, legal counsel for the Bank has recommended that a special committee be established for an independent investigation of such alleged wrongdoings; *that such special committee be authorized to retain legal counsel without prior affiliation with the Bank or its officers or directors for the purpose of advising the committee in the conduct of its investigation;* that the special committee be directed to report the results of such investigation to the full Board, accompanied by such recommendations as the Special Committee deems appropriate, *including the position the Bank should take in the pending litigation by Mr. Gaff and/or with respect to the officers or directors alleged to have participated in wrongdoings;* and that the committee be composed of directors who are not alleged to have participated in, or benefited from, such alleged wrongdoings;

(Def. Exhibit F) (Emphasis added).

Further, NBT already had its own general corporate counsel, Mr. Rollert, a fact which tends to belie defendants' assertions that they believed Hammond jointly represented NBT and themselves.

This evidence makes clear that the committee members, and other directors, fully understood that they were *potential adversaries* to NBT, and that it had not yet been decided whether their interests were congruent with those of the Bank.[3] Hammond's former client, NBT, has raised no objection to Donaldson's continued appear-

---

**3.** Defendants claim that they were not specifically advised that their interests were adverse to those of NBT. (Reply to Brief in Opposition to Motion to Disqualify and Enjoin Counsel, p. 6). The Comment to Rule 1.13 provides, in part,

Clarifying the Lawyer's Role

There are times when the organization's interest may be or become adverse to those of one or more of its constituents. In such circumstances the lawyer should advise any constituent, whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer

cannot represent such constituent, and that such person may wish to obtain independent representation. Care must be taken to assure that the individual understands that, when there is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constituent individual, and that discussions between the lawyer for the organization and the individual may not be privileged.

*Whether such a warning should be given by the lawyer for the organization to any constitu-*

ance in this case; this, too, supports the conclusion that there is no betrayal of a confidential attorney-client relationship by Donaldson's continued appearance in this case.

In light of this evidence, the Court cannot find the requisite attorney-client relationship, express *or* implied, between the individual defendants and attorney Hammond.

In the absence of such a relationship, Rule 1.10(b) does not require Donaldson's disqualification.

> *ent individual may turn on the facts of each case.*
> The facts of this case, including the fact that NBT already had general corporate counsel, show that defendants clearly understood that Hammond was not acting "for them."

4. In exploring the logic of Hammond's attorney-client relationship with NBT, the Court does not believe it obvious that Hammond could not actively oppose the defendants, even now, by reason of a "former, adverse" representation. Lest any party mistake comment for holding, the Court expressly does not decide the point.

Hammond's former client, NBT, has apparently repudiated the conclusions and recommendations of the first Special Litigation Committee. Would Hammond, as co-author of the report, be ethically prohibited from actively advancing that position, assuming *arguendo* that he still represented the Bank?

Had the report concluded that individual misconduct had occurred, and recommended that NBT bring suit against its officers and directors, there would arguably be no inconsistency in Hammond himself representing the Bank in any such suit. This possibility was rendered moot by the fortuitous turn of events, but was limned most forcefully in deposition testimony with regard to the disqualification of Novack & Macey:

> *We were told by the bank's attorney at that time that we could become adversaries, Levy & Erens could become adversaries of each of us and if we needed counsel down the road, we should hire our own counsel. That's about as specific as you can get.*
> (Deposition testimony of Creighton Wagener, pp. 5–6). (Emphasis added).

And, in describing Mr. Bay's testimony, FDIC counsel Novack brought out a very telling admission by Bay:

> Mr. Bay was also the only witness that he asked a very interesting question. He was asked—Mr. Bay, if the bank hadn't closed, and if the independent committee concluded that there were actions to be pursued against present directors, wouldn't it have been logi-

The Court recognizes defendants' concern that Hammond's partnership with Donaldson, as counsel for the shareholders, creates the appearance of Hammond's having "changed sides." See, e.g., *Allegaert v. Perot,* 565 F.2d 246, 251 (2d Cir.1977); *Evans v. Artek Systems Corp., supra* at 793. That concern does not arise, however, because of a pre-existing attorney-client relationship between Hammond and defendants,[4] but because of the prospect that Donaldson may be required to impeach evidence favorable to the defense.

> cal and expected that Levy & Erens would represent the bank against the directors.
> Your Honor, Mr. Bay, one of the movants in this case, a defendant in this case, a director in this case, *said "yes", because then, he wouldn't have to invest any more money in the new lawyer to get smart on the case.*
> (6–28–85 Hearing Tr. p. 142; Bay Dep., pp. 27–30). (emphasis added).

A similar rationale was expressed in *Evans v. Artek, supra* at 792, in the context of an intra-corporate dissident seeking to bring suit for mismanagement:

> However, when conflicts arise among factions within a corporation and its counsel is unable to represent all factions, since to do so would be to represent 'differing interests,' ABA Com. on Ethics and Professional Responsibility, Code of Professional Responsibility, Ethical Consideration 5–14; see *Yablonski v. United Mine Workers,* 448 F.2d 1175 (D.C.Cir.1971) (per curiam), an individual member of management or of the board of directors has the right to seek the advice of an attorney who does not represent the corporation as an entity but who can instead represent the plaintiff in an individual capacity or the faction of which the plaintiff is a member. In doing so, such individual member of management or of the board does not necessarily create an attorney-client relationship between the consulted attorney and the corporate entity itself. To so hold would be to penalize unnecessarily the intra-corporate dissident, or 'whistleblower,' since he/she would then be forced, if he/she were advised by his/her independent counsel that corporate management was violating the rights of stockholders and he/she then wished to take action, to hire a second attorney to bring suit.

An alternative scenario has Hammond and the Special Litigation Committee recommending discontinuance of the *Dalrymple-Gaff* suits, but soon thereafter, the Bank changes its position, and requests Hammond to bring suit. Although concerns of personal integrity and independent judgment might well compel Ham-

The conclusion that Donaldson is not disqualified by virtue of his partner's former representation of NBT does not mean that there are no ethical obstacles to Donaldson's continued appearance in this case. Rule 3.7(b) of the MRPC provides,

> (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Rule 1.7 provides,

> Rule 1.7 Conflict of Interest: General Rule
>
> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
>
> (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
>
> (2) each client consents after consultation.
>
> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>
> (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

At the hearing, it became clear that the independence of those involved in the creation of the first Special Litigation Committee is questioned by the shareholders. Candidly, it is in the shareholders' interests to impugn the findings of the committee and to demonstrate that it was no more than a sham proceeding.[5] Defense counsel "hit the nail on the head" in decrying the prospect of one partner, Donaldson, impeaching the integrity of the work of another partner, Hammond. Such a spectacle, without more, would be abhorrent. On the other hand, it also implicates the adequacy of Donaldson's representation of his clients, the shareholders. One can easily envision less-than-zealous advocacy by Donaldson on the part of Dalrymple in order to preserve intra-firm harmony between the two partners.

■ The rule permits an attorney to act as an advocate *at trial* where a fellow partner is likely to be a witness, *except* where precluded from doing so by, among other things,

> ... the lawyer's responsibilities to another client, *or to a third person, or by the lawyer's own interests.*

Hammond feels an obligation to uphold the report of the first committee, and recognizes that he is likely to be called as a witness for the defense. (Tr. pp. 10, 15–16, 18).

■ Although Hammond may not be a "necessary" witness, as required by Rule 3.7(a), Rule 3.7(b) imposes no requirement that the lawyer's testimony be "necessary," only that he be a "likely" witness. Hammond is a "likely" witness in this case.

---

mond to decline, it is not at all clear that a "former adverse representation" is implicated. See, e.g., Note, *Independent Representation for Corporate Defendants in Derivative Suits,* 74 Yale Law J. 525, 538, n. 69 (1965), where, with respect to the reports of special litigation committees, it was remarked,

> Admittedly, an anomalous situation may arise should the board of directors reject the memorandum opinion, for the independent counsel might be asked to represent the corporation in court in a manner which is inconsistent with his recommendations. *It is not un-*

*common, however, for lawyers to continue to represent clients who have rejected their advice.*

5. The Court explicitly states that it ascribes no such meretricious motives to the principals involved with the first Special Litigation Committee (or the second, for that matter). Nonetheless, the shareholders, as interested party-litigants, would undoubtedly seek to diminish the Committee and deprecate its findings.

Although Donaldson may well be disqualified from acting as trial counsel, the rule does not require his complete disqualification at this point. Trial of the shareholders' claims is not imminent, and is indeed speculative, in light of outstanding questions of whether there should be joint or separate trials of the respective claims of the FDIC and the shareholders.

The Court can envision the necessity of Donaldson's disqualification at some future time; that moment has not yet arrived.

Accordingly, the motion to disqualify J. Bruce Donaldson is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.