Curvin J. TRONE, Jr., Trustee for Westgate-California Corp., et al., Appellees,

v.

C. Arnholt SMITH, James F. Mulvaney, Richard P. Woltman, William B. Connoley, Voler L. Viles, et al., Appellants.

No. 77–1832.

United States Court of Appeals, Ninth Circuit.

June 23, 1980.

Thomas R. Sheridan, Simon & Sheridan, Los Angeles, Cal., Robert G. Steiner, Luce, Forward, Hamilton & Scripps, San Diego, Cal., for appellants.

Alan D. Croll, Los Angeles, Cal., argued for appellees; Wyman, Bautzer, Rothman & Kuchel, Los Angeles, Cal., on brief.

Before GOODWIN and KENNEDY, Circuit Judges, and HILL *, District Judge.

* The Honorable Irving Hill, United States District Judge for the Central District of California, sitting by designation.

GOODWIN, Circuit Judge:

We review [1] the district court's refusal to grant a motion to disqualify plaintiff's counsel. Whether the refusal was correct on the facts of this case turns upon the effect of the rule against suing a former client.

This appeal is one aspect of the complex litigation filed by the trustees in bankruptcy for Westgate-California Corporation (Westgate) and other entities, against a large number of individuals and entities, seeking compensatory damages of at least $500,000,000 and punitive damages of not less than $1,000,000,000. The 110-page complaint, incorporating 194 counts, alleges numerous violations by defendants of provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, the National Banking Act, and the Federal Reserve Act, as well as breaches of duties under state law.

Defendant C. Arnholt Smith was chairman of the board and chief executive officer of Westgate from its date of incorporation until November 2, 1973. Until May 24, 1973, Smith was also the principal shareholder, chairman of the board, president, and chief executive officer of the United States National Bank (USNB). Defendant C. Hugh Friedman was former counsel for Smith, Westgate, and USNB. The remaining defendants are former officers or directors of USNB or of related entities more or less controlled by Smith.

Plaintiffs are represented in this litigation by the firm of Wyman, Bautzer, Rothman & Kuchel (Wyman). Wyman's representation began with its appointment as special counsel for Westgate pursuant to an equitable consent judgment entered in *Securities Exchange Comm'n v. Westgate-California Corp.*, No. 73–217–N (S.D.Cal., Oct. 31, 1973). Wyman was thereby empowered to conduct an investigation into the financial affairs of Westgate and to take appropriate action in connection with that investigation, including the prosecution of actions for the benefit of Westgate or its shareholders to recover wasted or misappropriated assets. In February 1974, Westgate went into Chapter X reorganization proceedings, and Wyman assumed the capacity of general counsel to the trustees, pursuant to court order.

The pending action was filed in April 1975, after plaintiffs had completed their extensive investigation of Westgate's affairs. The district court referred pretrial and discovery proceedings to a magistrate pursuant to 28 U.S.C. § 636(b)(2). On August 9, 1976, at a hearing before the magistrate, counsel for Smith raised the possibility of a conflict of interest because of Wyman's prior representation of Smith.[2] A formal motion seeking Wyman's disqualification was filed shortly thereafter by all appellants.

The motion was based upon Wyman's legal services in 1972, at the request of Smith, in connection with a proposed secondary offering of 400,000 shares of Smith's personally-owned or controlled USNB stock. Salomon Brothers, a firm of underwriters, agreed to assist in the public offering. In connection with preparation of the offering, Salomon Brothers asked Smith to obtain a legal opinion letter from a law firm independent of Smith, USNB, and Friedman, who then represented both Smith and USNB. Smith accordingly retained Wyman, initially contacting Frank Rothman, a senior partner in the firm.

---

[1]. Whether or not we should take jurisdiction under 28 U.S.C. § 1291 pursuant to *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 496 F.2d 800 (2d Cir. 1974), cited in *Trone v. Smith et al.*, 553 F.2d 1207 (9th Cir. 1977), this court has usually taken jurisdiction of these cases by treating the appeal as a petition for mandamus. *See, e. g., Cord v. Smith*, 338 F.2d 516 (9th Cir. 1964) and *Chugach Electric Ass'n v. District Court*, 370 F.2d 441 (9th Cir. 1966) (order nonappealable, but mandamus allowed.) We have recently reiterated that an order denying a motion to disqualify a judge is nonappealable. *United States v. State of Washington*, 573 F.2d 1121 (9th Cir. 1978).

[2]. In this case, there is no dispute that Wyman previously represented Smith and that it has now accepted representation adverse to its former client.

The Wyman firm then began evaluating the circumstances of the offering for the preparation of a legal opinion letter to Salomon Brothers for inclusion in the offering circular. An interoffice memorandum prepared by Jerold Sherman, the Wyman attorney primarily responsible for the case, detailed the matters the firm believed required investigation in order to evaluate the need for disclosure in the circular. These matters included the following:

"11. * * * all sales and purchases of bank stock by Mr. Smith, Westgate, etc. to determine possible 16b violations or problems * * *.

"12. * * * how the bank approves all loans, * * *. We should determine what procedures they follow when the loan is to Mr. Smith, Westgate, etc. Is Mr. Smith's involvement disclosed at the time of the loans?

* * * * * *

"14. * * * all sales of assets owned personally by Mr. Smith or owned by Westgate or its subsidiaries, etc. to third parties whereby the purchaser finances the purchases through the bank, etc. (e. g. sale of Golden West Airlines).

* * * * * *

"34. Apparently the bank leases most of its offices from Westgate. We should determine if the bank financed the construction of the buildings owned by Westgate.

* * * * * *

"45. We should determine if there are any presently existing contractual arrangements between the bank and Westgate, US Holding, etc."

In carrying out the proposed investigation, Sherman reviewed major news stories involving the participants in the offering, examined the financial statements of relevant corporations, and inspected other public documents. He also participated in meetings with USNB employees, which were attended by at least one member of the Friedman firm, as well as by Smith and often by a representative of Salomon Brothers. Believing that information with respect to "sensitive" areas was not being provided, Sherman requested Rothman's assistance in convincing Smith that further disclosure was required. At a meeting between Sherman, Rothman, Friedman, and Smith in August 1972, Smith indicated that he had decided not to go ahead with the offering at that time because the timing was not right.

In October 1972, Wyman billed Smith for its efforts in the amount of $15,000 plus costs, as follows:

"SERVICES RENDERED through August 27, 1972 in connection with proposed registration, including meetings with principals, counsel and underwriters, review of corporate structure and preliminary review of various material contracts and transactions to determine scope of disclosures required under federal securities laws."

At the time of billing, Wyman contemplated that the matter might resume in the early part of 1973 and deferred a portion of its bill with that in mind. Wyman was paid in November 1972 by a cashier's check from USNB.

We turn next to Wyman's appointment as counsel for the trustee and the motion to disqualify. Prior to the firm's appointment as special counsel for Westgate in January 1974, Rothman told the court that Wyman had handled the sale of a produce business in 1969 and had participated in litigation involving Air California. Certain other of Wyman's legal services for Smith, but not the representation on the stock offer, had previously been disclosed to and considered by the district court. Following Rothman's disclosures, the district court approved the appointment. Wyman's representation of the trustees for Westgate was also considered by the district court at the request of the FDIC as receiver of USNB, prior to the resolution of litigation between the FDIC and the trustees. The court again approved the representation.

Obviously, a substantial amount of legal work had been done by the time the magistrate considered the disqualification motion. The magistrate recommended that the mo-

tion be denied on the grounds that there was no substantial relationship between Wyman's representation of Smith in 1972 with respect to the scope of disclosure required under Rule 10b–5 for the stock offering and Wyman's role in bringing this action against Smith and others charging breach of fiduciary duty while serving as officers and directors of Westgate and USNB.

The district court reviewed *de novo* the magistrate's conclusions and denied the motion for disqualification of the Wyman firm, making the following findings of fact and conclusions of law:

" * * * [T]he law firm of Wyman, Bautzer, Rothman & Kuchel represented only C. Arnholt Smith, and not United States National Bank (U.S.N.B.) or its directors, in the proposed secondary offering of U.S.N.B. securities in June 1972; that the representation was with respect to the stock offering only and continued for approximately one month; and that members of the Wyman firm gathered public information pursuant to that representation but were denied access to any confidential information by Mr. Smith.

"Accordingly, the court concludes that counsel for plaintiffs did not obtain any confidential information in their prior representation of Smith, and that the legal services rendered in the stock offering were not so related to the instant litigation to justify disqualification of counsel."

■ The relevant test for disqualification is whether the former representation is "substantially related" to the current representation. *See Gas-A-Tron of Arizona v. Union Oil Co. of California*, 534 F.2d 1322, 1325 (9th Cir.), *cert. denied*, 429 U.S. 861, 97

S.Ct. 164, 50 L.Ed.2d 139 (1976); *Westinghouse Electric Co. v. Gulf Oil Corp.*, 588 F.2d 221, 223 (7th Cir. 1978); *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir. 1978). The interest to be preserved by preventing attorneys from accepting representation adverse to a former client is the protection and enhancement of the professional relationship in all its dimensions. It is necessary to preserve the value attached to the relationship both by the attorney and by the client. These objectives require a rule that prevents attorneys from accepting representation adverse to a former client if the later case bears a substantial connection to the earlier one. *NCK Org'n Ltd. v. Bergman*, 542 F.2d 128 (2nd Cir. 1976). Substantiality is present if the factual contexts of the two representations are similar or related.

Perhaps the most important facet of the professional relationship served by this rule of disqualification is the preservation of secrets and confidences communicated to the lawyer by the client. If there is a reasonable probability that confidences were disclosed which could be used against the client in later, adverse representation, a substantial relation between the two cases is presumed.[3] Confidentiality, however, is not the only aspect of the professional tie preserved by the disqualification rule.

Both the lawyer and the client should expect that the lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client and in undertaking representation on the client's behalf. That professional commitment is not furthered, but endangered, if the possibility exists that the lawyer will change sides later in a substantially related matter. Both the fact and the appearance of total professional commitment are en-

---

**3.** The possible harshness of this rule is mitigated by the "peripheral representation" standard developed by the Second Circuit, under which an attorney previously associated with a firm that handled matters substantially related to those in which the attorney's disqualification is sought, may show that he or she had no personal involvement in such substantially related matters and did not actually receive any confidential information relevant to the matter in which disqualification is sought. *See Gas-A-Tron of Arizona v. Union Oil Co. of California*, 534 F.2d 1322, 1324–25 (9th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 754 (2d Cir. 1975).

dangered by adverse representation in related cases. From this standpoint it matters not whether confidences were in fact imparted to the lawyer by the client. The substantial relationship between the two representations is itself sufficient to disqualify.

The rule we state is necessary to implement the following canons of professional ethics: Canon 1 (maintaining integrity and confidence in the legal profession); Canon 4 (preserving confidences and secrets of a client); Canon 5 (exercise of independent professional judgment); Canon 6 (representing a client competently); Canon 7 (representing a client zealously within bounds of the law); Canon 9 (avoiding even the appearance of professional impropriety).

As we have stated, the underlying concern is the possibility, or appearance of the possibility, that the attorney may have received confidential information during the prior representation that would be relevant to the subsequent matter in which disqualification is sought. The test does not require the former client to show that actual confidences were disclosed. That inquiry would be improper as requiring the very disclosure the rule is intended to protect. *See Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d at 224 and n.3. The inquiry is for this reason restricted to the scope of the representation engaged in by the attorney. It is the possibility of the breach of confidence, not the fact of the breach, that triggers disqualification.

█ Once the attorney is found to be disqualified, both the attorney and the attorney's firm are disqualified from suing the former client. *See Government of India v. Cook Industries, Inc.*, 569 F.2d at 739–40; *NCK Org'n Ltd. v. Bergman*, 542 F.2d 128, 132–34 (2d Cir. 1976). Canon 4 applies not only to the individual attorney. Confidential information possessed by one attorney may or may not have been shared

with other members of the firm, but the firm as a whole is disqualified whether or not its other members were actually exposed to the information. *See Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1318 (7th Cir. 1978); *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d 706, at 710 (7th Cir.)[4]

█ The district court's order denying disqualification of the Wyman firm was inconsistent with strict standards of professional conduct. The primary responsibility for controlling the conduct of lawyers practicing before the district court rests with that court. *See Richardson v. Hamilton International Corp.*, 469 F.2d 1382, 1385–86 (3d Cir. 1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). And where the matter is discretionary, we will not reverse the district court unless it abused its discretion in this area. *See Gas-A-Tron of Arizona v. Union Oil Co. of California*, 534 F.2d at 1325.

In this case, however, the district court misperceived the rule of law and failed to give adequate consideration to the nature and scope of Wyman's prior representation of Smith. The court should have compared the scope of representation undertaken by the attorneys in each case. Here, a reasonable probability existed that in the first case Smith relayed confidential information to the attorneys. Although Wyman was retained for a limited purpose, the scope of its lawyers' inquiry pursuant to that representation was not as limited as the district court's findings would indicate. There was a substantial similarity between the two professional employments in these circumstances.

The law firm's files show that Wyman contemplated inquiry into the procedures followed by USNB in approving loans, the sale of assets by Smith where the purchase was financed through USNB, the interest

4. We do not reach, and therefore express no opinion upon, the "Chinese Wall" theory under which disqualification motions have been resisted without success by large law firms whose branch offices in distant cities may have "sealed off" apparent conflicts between offices.

*See, e. g., Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 435 F.Supp. 84 (S.D.N.Y.1977) *aff'd in part, rev'd in part*, 567 F.2d 225 (2nd Cir. 1977). *See also, Omni Developments, Inc. v. Porter*, 459 F.Supp. 930 (S.D.Fla.1978).

rates charged by USNB in various transactions, and other relationships between USNB and Westgate. Given this contemplated line of evaluation, the nature of the 1972 representation was such that confidential information ordinarily would have been communicated. Wyman's contemplated inquiry, if not stopped, would have revealed many aspects of Smith's relationship with USNB and Westgate that lie at the heart of the present litigation. The fact that Smith refused to answer "sensitive" questions in response to Wyman's inquiry is itself a form of confidential lawyer-client communication. As noted above, it is not necessary to establish that confidential information was in fact given, the reasonable probability is sufficient. Even if it were stipulated that no confidences were communicated in the first professional employment (and no such stipulation has been made by the parties here), the subject matters of the professional representation undertaken in each case were so interlinked by reason of common factual background that the requisite substantiality of relation for disqualifying the attorneys existed here. If Smith's earlier professional relationship with Wyman had been aborted before any significant work had been done in the stock offering and before any discussions with the client other than the bare preliminaries of the representation were explored, we might now have a different case. That is not, however, what occurred. In this case, Wyman's first representation of Smith was sufficiently extensive that institutional standards of the legal profession impose upon the attorneys a continuing obligation to the client not to change sides after the representation has ceased. This obligation is what distinguishes a professional relationship from one involving merely a barter and sale.

■ Wyman argued, and the district court found, that there was no close relationship between the matters involved in the two representations. That finding is plainly wrong. The district court found that Wyman's prior representation was with respect to the proposed 1972 stock offering only, lasted but one month, and

that no substantial relationship existed because the complaint in the instant case contains no allegation concerning that offering as a basis for liability. This inquiry was insufficient and missed the point. The substantial relationship test does not require that the issues in the two representations be identical.

■ The relationship is measured by the allegations in the complaint and by the nature of the evidence that would be helpful in establishing those allegations. Among the numerous allegations in the complaint in this case are charges with respect to Westgate's purported borrowings for the benefit of others, the purchase and sale of assets by Westgate at other than a fair market value, and Westgate's alleged practice of borrowing at excessive interest rates to improve the financial condition of USNB and to finance self-dealing transactions. The information sought in the course of Wyman's prior representation of Smith, whether disclosed to Wyman or not, would be of value in establishing the truth of Wyman's present allegations.

Although the issues presented in the two representations are not identical, their relationship is strong. It reasonably could be said that during the prior representation the attorneys were trying to acquire information vitally related to the subject matter of the pending litigation. *See Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d at 226–27 (information with respect to uranium reserves acquired during course of work on leases and title disputes relevant to charge of conspiracy to fix prices by restricting production); *Government of India v. Cook Industries, Inc.*, 569 F.2d at 739 (information with respect to loading and billing procedures acquired during defense of "short weight" case relevant to prosecution of similar claim for another party); *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 570 (2d Cir. 1973) (information with respect to parent-subsidiary relationship acquired while defending parent relevant to subsequent suit against subsidiary corporation); *Richardson v. Hamilton Inter-*

*national Corp.*, 469 F.2d 1382 (3d Cir.) (information acquired while defending against SEC investigation of possible securities laws violations relevant to suit based on allegedly false and misleading proxy statement).

Here, Wyman had an opportunity to learn of Smith's, Westgate's, and USNB's policies, practices, and procedures. The ethical obligations inherent in the professional relationship between attorney and client require us to protect against any possibility that this information, if acquired, might be used against the former client. Accordingly, we hold that the Wyman firm must be disqualified from further representation of plaintiffs against Smith, even though we do not suggest that Wyman has used or plans to use in this case any information it learned while representing him in 1972.

Wyman suggests that disqualification is not required in this case because Rothman fully disclosed to the court the fact of Wyman's prior legal work on behalf of Smith before the court appointed the firm special counsel for Westgate. Wyman then argues that the court's approval must now be deemed final—a sort of res judicata effect.

Our review of the record has revealed only the following testimony by Rothman in this regard:

"I was the partner who was originally contacted by Judge Nielsen [with respect to the appointment]. I was aware of the fact that we had represented Mr. Smith. I was aware of the fact that we had handled a sale of a produce business in 1969, and I was aware of the fact that we were in some litigation involving Air California. I met first with Mr. Kuchel and advised him of those facts.

"At that point those were the only potential areas that I felt should be discussed in the interest, not so much of conflict, but just in the interest of objectivity and fairness. I knew of no others. I considered no others that I could conceive of."

That the above disclosure was made does not alter our determination that disqualification of the Wyman firm is required. Even if the quoted disclosure had dealt specifically with Wyman's 1972 work for Smith, which it did not, the court's earlier approval of Wyman's representation of the trustees in light of that disclosure would not be dispositive of the pending disqualification motion.

Disqualification does not depend upon proof of the abuse of confidential information. Because of the sensitivity of client confidence and the profession's institutional need to avoid even the appearance of a breach of confidence, disqualification is required when lawyers change sides in factually related cases. The district court applied too permissive a standard, and thus erred in failing to remove counsel.

There remains the problem of Wyman's representation of the trustees against the remaining defendants in the case. Although none of these defendants was ever technically in an attorney-client relationship with the Wyman firm, the multiple and interlocking bonds between all defendants and Smith require us to cut the Gordian knot in this case and disqualify the firm from representing plaintiffs against all defendants.[5] While the facts of this case are not as compelling as those described in *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978), the principles discussed therein are

---

5. In *Novo Terapeutisk, etc. v. Baxter Travenol Lab.*, 607 F.2d 186 (7th Cir. 1979), the en banc court affirmed an order refusing to disqualify a lawyer, but the opinion in no way detracts from the force of *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221 (7th Cir. 1976). In *Novo Terapeutisk*, the lawyer, who had formerly represented his present client while a member of a law firm, had left the firm. His old firm, now representing a new client, was ad-

vancing an interest adverse to his client. On these facts, where the lawyer had failed to allege that any relevant information he may have possessed about his client had been transmitted to anyone else in his old firm, the court held that it was inappropriate to indulge in a conclusive presumption that confidential information had been transmitted. On those facts, we might agree, although the question is not before us.

applicable. Fiduciary obligations and professional responsibilities may warrant disqualification of counsel in appropriate cases even in the absence of a strict contractual attorney-client relationship. 580 F.2d at 1316–20. Smith's potential liability in this case is inextricably intertwined with that of the other defendants. The interrelation compels the conclusion that the appearance of a fair trial for Smith cannot be guaranteed while Wyman is present in the courtroom on behalf of plaintiffs, even as co-counsel. Accordingly, we hold that the Wyman firm must be disqualified from further representation of plaintiffs against Smith's co-defendants so long as all parties remain joined for trial.

We are not unmindful of the possible hardship our decision may impose upon the trustee estate. The burden on both the trustee and the court is bound to be substantial. And we recognize our responsibility to preserve a balance between plaintiffs' right to their own freely chosen counsel and the profession's need to preserve the highest ethical standards. *See Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d at 753. However, disqualification is required in this case, and we leave it to the district court upon remand, in the exercise of its control over the litigation pending before it, to develop appropriate methods for minimizing the burdens and delays inherent in a change of attorneys in the midst of complex litigation.

Remanded with instructions to order the removal of counsel.