In re CALIFORNIA CANNERS AND GROWERS, a California agricultural non-profit cooperative association, Debtor.

CALIFORNIA CANNERS AND GROWERS, a California agricultural non-profit cooperative association, Plaintiff,

v.

BANK OF AMERICA, N.T. AND S.A., Sacramento Bank for Cooperatives, Central Bank for Cooperatives, Wells Fargo Bank, N.A., Mellon Bank, California First Bank, and Does 1 through 120, Defendants.

Bankruptcy No. 3–83–01255–JR.
Adv. No. 3–86–0339–JR.

United States Bankruptcy Court, N.D. California.

May 27, 1987.

See also 9th Cir. BAP, 62 B.R. 18.

Dennis D. Montali, Pillsbury, Madison & Sutro, San Francisco, Cal., for Bank of America, NT & SA.

Michael Traynor, Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, Cal., for the Law Firm of McCutchen, Doyle, Brown & Enersen.

Thomas A. Casazza, San Jose, Cal., pro se.

James E. Herman, A. Barry Cappello, Cappello & Foley, Santa Barbara, Cal., for the Law Firm of Cappello & Foley.

William Bates, III, Loyd W. McCormick, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for debtor California Canners and Growers.

Richard Levin, Stutman, Treister & Glatt, Los Angeles, Cal., for Special Counsel.

David McCarty, Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for Sacramento Bank of Cooperatives and Central Bank of Cooperatives.

## OPINION

THOMAS E. CARLSON, Bankruptcy Judge.

Defendant Bank of America moves to disqualify Plaintiff's counsel in this action for alleged violations of the California Rules of Professional Conduct. Defendant alleges that Debtor's special counsel for this action: (1) participated in a breach of ethical duties by Debtor's general bankruptcy counsel against Defendant; and (2) have received confidential information regarding Defendant from Debtor's general bankruptcy counsel. I find that cause exists to disqualify Plaintiff's special counsel and general bankruptcy counsel and grant Defendant's motion.

**FACTS**

(1) *General background.* Debtor California Canners and Growers (Cal Can) is a cooperative association of agricultural growers and canners that was formed in 1957, and did business in California until 1983. McCutchen, Doyle, Brown and Enersen (McCutchen) has been Cal Can's counsel throughout its period of existence. Loyd W. McCormick is the partner primarily responsible for legal representation of Cal Can.

Cal Can's business required yearly infusion of outside capital to "fund" each year's picking and canning season. Loans had been made in the past by various banks, including Bank of America, N.T. and S.A. (Bank of America). Bank of America had been a primary lender to Cal Can. In May 1983, Bank of America informed Cal Can that it would not fund operation for that season, but that it would provide financing should Cal Can decide to liquidate under the Bankruptcy Code.

Cal Can filed for relief under Chapter 11 of the Bankruptcy Code on June 13, 1983 and continued to operate as Debtor-in-Possession. McCutchen was appointed bankruptcy counsel for Cal Can on June 23, 1983, and has represented Cal Can throughout the bankruptcy case. William Bates, III is the McCutchen partner primarily responsible for Cal Can bankruptcy matters. The law firm of Goldberg, Stinnett and McDonald, specialists in bankruptcy law, was also appointed counsel for Debtor-in-Possession Cal Can.

Several banks, including Bank of America, provided post-petition financing to Cal Can, totalling approximately $22.7 million. Cal Can still owes the banks approximately $6.0 million from that post-petition financing. The banks also participated in and helped negotiate the post-petition sale of Cal Can assets to Tri-Valley Growers. That sale resulted in the almost complete liquidation of Cal Can.

(2) *Cal Can's suit against Bank of America.* Cal Can filed suit against Bank of America, Sacramento Bank for Cooperatives, Central Bank for Cooperatives, Wells Fargo Bank, Mellon Bank, and California First Bank on April 18, 1986. The complaint alleges ten causes of action for fraud, constructive fraud, and breach of contract. In summary, Cal Can contends that the refusal of the banks to fund the

1983 packing season was wrongful, that the decision was taken for an improper purpose (to force Cal Can to liquidate), and that Cal Can's bankruptcy and liquidation resulted from the refusal to fund.

Debtor clearly contemplated asserting claims against the banks long before it filed the complaint. At a pre-filing meeting to discuss work-out financing, Loyd McCormick of McCutchen informed counsel for the banks that if they forced Cal Can into bankruptcy Cal Can would sue them. On various occasions after the bankruptcy filing, officers of Cal Can asked McCormick and Bates whether McCutchen would represent Cal Can in an action against the banks. McCutchen stated it would not act as counsel for Cal Can in such an action, because McCormick and Bates were both percipient witnesses of events that allegedly led to Cal Can's bankruptcy. Bates and McCormick also counselled against filing an action immediately, because the banks might retaliate against Cal Can or against former Cal Can members who had become members of Tri-Valley Growers after the sale of Cal Can's assets by cutting off post-filing financing.

In the Fall of 1983, Bates was contacted by Thomas Casazza (Casazza), an attorney for some individual members of Cal Can. Casazza asked Bates whether Cal Can intended to file suit against the Banks. Casazza said he hoped to coordinate the debtor's claims with antitrust claims that individual growers were contemplating. On November 9, 1983, Casazza met with Bates and McCormick of McCutchen, and officers of Cal Can. McCormick told Casazza that Cal Can had decided not to pursue those claims at that time and asked Casazza to refrain also, lest the post-petition financing be jeopardized.

In August 1984, Perkins & Coie (Perkins), a Seattle law firm that represented the Western Conference of Teamsters, contacted Bates about possible litigation against the banks. On several occasions thereafter, Bates met with Perkins to discuss the factual background of Cal Can's claim against the banks and possible theories of recovery. In March 1985, Perkins sent Bates a draft complaint alleging antitrust violations. Bates reviewed the complaint, made minor factual corrections and comments, and forwarded the complaint to John Hauser, an antitrust attorney at McCutchen. Hauser read the complaint and informed Bates that he thought it stated a cause of action based on antitrust law. Prosecution of this action, however, was dependent upon the Teamsters' funding of the litigation. In mid–1985, the Teamsters decided not to fund the suit and the complaint was never filed.

In mid–1985, Cal Can began to pursue its claim against the banks more actively. It did so because the banks had cutoff post-petition financing, and could no longer take retaliatory actions against Cal Can. Moreover, the liquidation of the Cal Can was virtually complete. The only significant asset remaining unliquidated was its claim against the banks.

In late Summer 1985, Cal Can asked Bates to recommend a law firm to prosecute its claim against the banks. After recommending the law firm of Khourie & Crew of San Francisco (Khourie), Bates met with the firm on September 5, 1985, and asked them to represent Cal Can against the banks. Khourie told Bates that they would require a large retainer.

On February 27, 1986, Bates, Khourie, and Casazza attended a Cal Can Board of Directors meeting. Khourie made a presentation regarding the proposed litigation, explaining the theories to be put forward and the likelihood of success. Casazza discussed funding of the litigation. The Board resolved to pursue litigation against the banks if funding could be obtained.

Bates was given the task of creating and proposing a funding scheme that could be approved by the bankruptcy court. He contacted the attorney for the Creditors' Committee and individual creditors seeking to raise funds for the litigation. Michaela Cassidy, Vice President of Cal Can, attempted to secure funding commitments from former Cal Can growers. They were unable to raise the amount required by Khourie, however, and Khourie declined to accept the case.

Casazza then contacted the law firm of Cappello & Foley of Santa Barbara (Cappello). Casazza and Cappello began jointly to draft a complaint against the banks based on alleged wrongful lending practices. In aid thereof, Michaela Cassidy of Cal Can forwarded a copy of the Perkins' complaint to Cappello. Cappello and Casazza filed the present action against Bank of America and other banks (the Cal Can Action) in Sacramento Superior Court on April 18, 1986.

Bank of America removed the action to the United States Bankruptcy Court for the Eastern District of California. Venue was transferred to this district, where the Cal Can bankruptcy case is pending. Cal Can then moved in the District Court to have the action either remanded to the State court or heard by the District Court. That motion was denied by District Judge Lloyd Burke on January 9, 1987.

(3) *McCutchen's defense of Bank of America in the Gregori and Lines suits.* In October 1985, six months before the Cal Can Action was filed, Bank of America asked McCutchen to represent the banks in *Lines v. Bank of America* (the Lines Action). The Lines Action involved a lender liability claim against the bank.

In January 1986 and March 1986, Bank of America retained McCutchen to defend it in six other lawsuits filed in Sonoma County Superior Court (the Gregori Actions). These actions all question Bank of America's loan practices in the agricultural industry and assert claims against the bank for fraud, breach of fiduciary duty, and breach of contract. Cappello represents the plaintiffs in three of these actions.

Cappello had also represented a cross-complainant in the case of *Kruse v. Bank of America,* a suit for damages based on the bank's refusal to continue financing to a plaintiff/grower in Sonoma County. That suit resulted in a $37.5 million judgment against the bank, reduced to $22 million on remittitur. The bank has appealed the judgment.

The parties do not dispute that substantial similarities exist between the legal theories propounded in the Cal Can Action, and those advanced in the Lines and Gregori Actions. Indeed, McCutchen does not dispute that the same witnesses could be involved in each of the suits. That Bank of America freely made documents and bank personnel available to McCutchen to help it develop the bank's defense in the Lines and Gregori Actions is also undisputed. McCutchen asserts, however, that no information was passed from the attorneys involved in the Lines and Gregori Actions to the attorneys working on the Cal Can bankruptcy proceedings.

(4) *McCutchen's disclosure of conflict to Bank of America.* Bank of America asked McCutchen to represent it in the Lines Action at a meeting between Winslow Christian and George Duff of Bank of America's legal department and David M. Balabanian and James Hunt of McCutchen. Balabanian reminded Christian that McCutchen frequently represented the interests of farmers and cooperative groups in loan negotiations and other matters. Christain replied that, in his opinion, such representation would not pose a conflict. Christian was also later advised that McCutchen represented Cal Can in its bankruptcy proceedings. McCutchen attorneys did not, however, inform Bank of America attorneys of Cal Can's intent to file a suit against the bank. The bank never gave McCutchen any written waiver of conflicts of interest.

McCutchen did not voluntarily disclose its role in the Cal Can Action. In June 1986, counsel for Bank of America took the deposition of Bates in reviewing a fee application McCutchen filed in the bankruptcy case. The bank then first learned that McCutchen had participated in bringing the Cal Can Action. The bank also learned that McCutchen had created a special "internal account" to record time spent on litigation against the banks. Bates stated that this internal account was not disclosed in fee applications to avoid alerting the banks about the contemplated suit. The account revealed that Bates and other attorneys in the bankruptcy department at McCutchen had performed services of approximately $8,750 in discussing the claim

against the banks and in seeking funding for prosecution of that claim. Bank of America terminated McCutchen as its counsel in the Lines and Gregori Actions on July 17, 1986.

(5) *McCutchen's activity after termination by Bank of America.* McCutchen has continued to represent Cal Can in this bankruptcy case after being discharged by Bank of America as defense counsel in the Lines and Gregori Actions. That representation has included repeated appearances on behalf of Cal Can to urge employment of Cappello and Casazza as special counsel in the Cal Can Action, two motions to obtain financing to fund that litigation, and defense of the bank's motion to disqualify Cappello and Casazza as special counsel.

Cappello and Casazza were appointed special counsel for Debtor in the Cal Can Action by *ex parte* application on May 27, 1986. The application recited the following terms of compensation. Certain unnamed equity holders of Cal Can would advance funds to special counsel as a retainer to be used for fees and costs. Those equity holders were to receive up to eight times the amount of their contribution, or as much as $3.6 million, from proceeds of the recovery against the defendant banks.

Bank of America moved to vacate the order appointing Cappello and Casazza. A hearing on the motion was set for July 22, 1986. Bank of America filed a lengthy brief in support of its motion. The bank argued that the proposed mechanism for funding the litigation from contributions by equity holders constituted illegal and unethical fee splitting, violated securities laws, and failed to disclose essential information. Bank of America also argued that conflict of interest concerns prohibited McCutchen from participating in the Cal Can Action in any way, because of its former representation of the bank in the Lines and Gregori cases.

William Bates of McCutchen and Cappello appeared at the July 22, 1986 hearing and argued in favor of the funding scheme and employment of Cappello and Casazza as special counsel. Cappello stated that he knew Bank of America had fired McCutch-

en from the Lines and Gregori Actions because of its participation in the Cal Can Action. At the conclusion of the hearing, Bankruptcy Judge Jack Rainville denied the motion to employ Cappello and Casazza as special counsel on the basis that the funding scheme was "not only illegal, but unseemly."

McCutchen filed an amended motion to employ Cappello and Casazza as special counsel on November 7, 1986. The amended application set forth a new plan for raising money to fund prosecution of the Cal Can Action. Bank of America again objected to the employment of Cappello and Casazza on the basis that the funding scheme was illegal. The bank also argued that Cappello and Casazza were subject to vicarious disqualification, because of McCutchen's conflict of interest and stated that it intended to bring a formal motion to disqualify them. A hearing on the motion was set for January 22, 1987 before Bankruptcy Judge Lloyd King. William Bates of McCutchen, James Herman of Cappello, and Thomas Casazza appeared at the hearing to support employment of Cappello and Casazza and approval of the funding scheme. Judge King concluded that Cal Can's funding motion was "intertwined" with Bank of America's disqualification motion and that the two motions should be heard together. A joint hearing on both motions was scheduled for March 30, 1987.

McCutchen appeared at the March 30 hearing to support the amended plan for financing the suit against Bank of America. The three hearings regarding Cal Can's proposal for funding the litigation against the banks (July 22, 1986; January 22, 1987; and March 30, 1987) are hereinafter referred to as the Funding Proceedings. McCutchen also hired independent counsel to defend its conduct and oppose Bank of America's motion to disqualify Cappello and Casazza.

**DISCUSSION**

**I**

**DISQUALIFICATION OF McCUTCHEN**

The court must first determine whether McCutchen breached an ethical duty to-

ward Bank of America. Although the bank did not formally move to disqualify McCutchen in its written motion, establishing a breach of duty by McCutchen is a necessary element in the bank's motion to disqualify Cappello and Casazza.

■ I conclude that McCutchen breached a duty to Bank of America in representing Cal Can against the bank in the Funding Proceedings. Such representation was adverse to the bank, because it involved opposing Bank of America in court proceedings that were an essential part of a major lawsuit against the bank. McCutchen was prohibited from representing Cal Can in proceedings adverse to Bank of America, because the bank was a client of McCutchen.[1] Even if Bank of America is considered to have been a former client at the time of the Funding Proceedings, McCutchen could not represent Cal Can because the Cal Can Action against the bank was substantially related to the Lines and Gregori Actions, in which McCutchen formerly represented the bank.[2] I conclude that McCutchen should be disqualified from further participation in the Cal Can Action.

The Local Rules of this court provide that the applicable standards of professional conduct shall be those established by the Rules of Professional Conduct of the State Bar of California. Rule 110–3, Local Rules of the United States District Court for the Northern District of California. Only decisions under the California Rules are directly controlling. The applicable California rules, however, are similar in substance to the ABA Model Rules of Professional Conduct and to the rules of professional conduct adopted by other states. Thus, decisions under those other rules also provide useful guidance.

## A. Duty to Present Client

Rule 5–102(B) of the California Rules of Professional Conduct provides: "A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned."[3] This rule has been uniformly interpreted to prohibit an attorney from accepting any case in which he would have to oppose a current client in a lawsuit, unless the client consents. This bar applies whether or not the lawsuit is related to the matter on which the attorney represents the client. *See Jeffry v. Pounds,* 67 Cal.App.3d 6, 10–11, 136 Cal.Rptr. 373, 375–77 (1977). *Accord, I.B.M. Corp. v. Levin,* 579 F.2d 271, 280 (3d Cir.1978); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 232–233 (2d Cir.1977); *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1386 (2d Cir.1976); *Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 Harv.L. Rev. 1244, 1296–98 (1981) (hereinafter *"Developments"*); American Bar Association, Annotated Model Rules of Professional Conduct, Rule 1.7 at 73–74, 77–78 (1984) (hereinafter "Model Rules"); G. Hazard & W. Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct,* 130, 133, 138–39 (1985) (hereinafter "Hazard").

The rule precluding an attorney from prosecuting a suit against a present client is based on the attorney's duty of loyalty to the client. *Jeffry,* 67 Cal.App.3d at 10–11; 136 Cal.Rptr. at 376; *Fund of Funds,* 567 F.2d at 232–33; *Cinema 5,* 528 F.2d at 1386; *Developments, supra,* at 1293–1302; Model Rules, *supra,* Rule 1.7 at 77–79. This duty of loyalty is based on two considerations. First, an attorney who represents one client against another in a lawsuit may not present his case vigorously

---

**1.** As explained in Part IA, *infra,* an attorney may not accept representation adverse to a *present* client, even if it is wholly unrelated to the matter on which the attorney represents the client.

**2.** As explained in Part IB, *infra,* an attorney may not accept representation adverse to a *former* client, if it is substantially related to the matter on which the attorney represented the client.

**3.** The ABA Model Rules of Professional Conduct are similar. Rule 1.7 provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

for fear of antagonizing the second client, especially where the second client is the more important to the attorney economically. *I.B.M.*, 579 F.2d at 280; *Developments, supra*, at 1293–99; Model Rules, *supra*, Rule 1.7 at 77–79. The second basis for the duty of loyalty is preservation of the client's expectations of receiving the attorney's undivided loyalty.

Engaging an attorney has aptly been compared to making a "limited-purpose friend"—a "friend in regard to the legal system." Most clients probably view the relationship this way and expect that their lawyer will, in conformity with the classical definition of friendship, adopt their (legal) interests as his own. But while a client certainly expects his attorney to adopt his interests in any matter in which the attorney has been retained, this expectation may also extend to matters in which the lawyer has not been specifically engaged. It seems improbable that many clients recognize a further limitation on an attorney's already "limited-purpose" friendship that would render the friendship "matter-specific." This helps to explain why most clients would probably feel offended and in some sense abused were they to discover that the attorney who represents them in one matter had simultaneously undertaken to oppose them in another. The prevailing proscription of such representations can therefore be understood as safeguarding certain common expectations that are deeply rooted in the psychology of attorney-client "friendship."

*Developments, supra*, at 1302 (footnotes omitted). *Accord, Jeffry*, 67 Cal.App.3d at 10–11, 136 Cal.Rptr. at 376–77; Model Rules, *supra*, Rule 1.7 at 77.

■ Because the rule is based on a duty of loyalty, a client seeking to prevent his attorney from representing an opposing party in a lawsuit need not show that the attorney is using confidential information obtained from the client against that client. *See Jeffry*, 67 Cal.App.3d at 9–10; 136 Cal. Rptr. at 375; *IBM*, 579 F.2d at 281–83.

■ The prohibition against suing a present client extends to all members of the attorney's firm. *See Raley Co. v. Superior Court*, 149 Cal.App.3d 1042, 1048–49, 197 Cal.Rptr. 232, 237 (1983); *Cinema 5*, 528 F.2d at 1387; *Developments, supra*, at 1360–63; Model Rules, Rule 1.10(a) at 116, 121–22, 125; *Hazard, supra*, at 191–92. A client seeking to disqualify the entire firm on this basis need not show that other members of the firm have access to any information or files concerning the client. *See IBM* 579 F.2d at 282; *Hazard* at 191–92.

Respondents offer three different reasons why McCutchen did not violate its duty of loyalty to Bank of America. First, they argue that McCutchen's participation in the Funding Proceedings was not adverse to the bank. Second, they argue that Bank of America was no longer a client of McCutchen during the Funding Proceedings. Third, they argue that the bank consented to McCutchen's representation of Cal Can. None of these arguments is persuasive.

1. *The Interests of Bank of America and Cal Can are adverse.* I conclude that McCutchen's representation of Cal Can in the Funding Proceedings was adverse to the interests of Bank of America. McCutchen argues that it did no more than necessary to refer the Cal Can Action to Cappello. It is well established that an attorney disqualified from representing a client in a particular matter may take actions necessary to refer that matter to new counsel. *See NCK Org'n Ltd. v. Bregman*, 542 F.2d 128, 136 (2d Cir.1976). McCutchen's representation of Cal Can in the Funding Proceedings, however, went well beyond mere referral of the action. First, obtaining funding was an essential aspect of prosecuting the Cal Can Action. Two law firms had previously declined to take the case on a pure contingent-fee basis. Moreover, the funding in question was sought only for the purpose of furthering the litigation against the banks, including Bank of America. Second, the proposed funding scheme was itself a complex legal matter that entailed court hearings at which McCutchen opposed the bank. Cal Can proposed to issue securities to raise

the funds necessary for the suit, and the issuance of those securities required approval of the bankruptcy court. Bank of America actively contested approval of the proposed funding scheme. McCutchen defended the funding scheme at three hearings before this court. In sum, McCutchen actively represented Cal Can against the Bank of America in hotly contested proceedings integral to Cal Can's action against the bank. That these activities were adverse to the legal interests of the Bank of America is beyond question.

■ *2. McCutchen's duty is determined under the "present client" standard.* I also conclude that Bank of America must be considered to be a present client of McCutchen for the purpose of determining McCutchen's duties toward the bank. The bank discharged McCutchen as its counsel in the Lines and Gregori actions shortly after the Cal Can Action was filed. Although much of McCutchen's efforts to obtain funding for the Cal Can Action took place after the bank fired McCutchen, termination of representation must be disregarded if the client discharges the attorney because of an alleged breach of loyalty or the attorney voluntarily resigns because of a conflict. To hold otherwise would permit the attorney to accomplish indirectly what he or she may not do directly. The Ninth Circuit stated this principle succinctly in *United Sewerage Agency, etc. v. Jelco, Inc.*, 646 F.2d 1339, 1345 n. 4 (9th Cir.1981) (citations omitted).

[Client # 1] argue[s] that the "present client approach" is inapplicable here because [Client # 2] has dismissed [the attorney] from its employ. [Client # 2 correctly cites] the proposition that the present-client standard applies if the attorney simultaneously represents clients with differing interests. This standard continues even though the representation ceases prior to the filing of the motion to disqualify. If this were not the case, the challenged attorney could always convert a present client into a "former client" by

choosing when to cease to represent the disfavored client.[4]

*3. Waiver of conflict.* I conclude that Bank of America did not consent to McCutchen's representing Cal Can in the Funding Proceedings. California Rule of Professional Conduct 5–102(B) expressly requires that a client's consent to conflicting representation be in writing. Moreover, a waiver of a conflict is valid only if the attorney has informed the client fully about the nature of the conflict. *Klemm v. Superior Court*, 75 Cal.App.3d 893, 900–02, 142 Cal.Rptr. 509, 513–14 (1977); *United Sewerage Agency, etc. v. Jelco, Inc.*, 646 F.2d 1339, 1345–46 (9th Cir.1981); *Developments, supra*, at 1311–14; Model Rules, Rule 1.7 at 79. The alleged consent here meets neither requirement.

■ It is undisputed that McCutchen did not obtain a written waiver from Bank of America. Nor did McCutchen adequately explain to the bank the nature of the conflict. McCutchen argues that it fully disclosed the conflict, because: (1) it had advised the bank before it retained McCutchen in the Lines and Gregori Actions that Cal Can might sue the bank; (2) the bank consented to McCutchen's representing Cal Can as Debtor-in-Possession in the bankruptcy case; and (3) McCutchen's representing the bank in the Funding Proceedings was within the scope of its duties as counsel for Debtor-in-Possession. This argument is unpersuasive.

McCutchen's disclosure was inadequate for two reasons. First, the bank would be effectively warned that Cal Can intended to sue the bank only if it connected information provided to different representatives of the bank at different times. McCutchen advised the bank's litigation director that it was representing Cal Can as general bankruptcy counsel in October 1985. McCutchen's warning that Cal Can might sue the bank, however, was made to outside counsel two years earlier. Requiring the bank to connect these two pieces of information inverts the proper standard. It is the duty

**4.** I conclude that McCutchen was prohibited from participating in the Funding Proceedings, even if Bank of America is considered to have

been a former client at that time. *See* Part IB, *infra.*

of the attorney to make full disclosure of a conflict, not the duty of the client to discover it. *See* Model Rules, *supra,* Rule 1.7 at 79.

Second, McCutchen's disclosure that it was serving as general bankruptcy counsel for Cal Can is not disclosure that it would participate in bringing a lawsuit against Bank of America. As explained above, the bank is not charged with knowledge that Cal Can would file a suit. That McCutchen would participate in any suit of this dimension was also far from inevitable. In a large reorganization, the general bankruptcy counsel frequently hires separate counsel to represent the estate in any major litigation. Finally, and most important, although the interests of Cal Can as debtor and Bank of America as a creditor are generally adverse, the degree and importance of the conflict between those parties in a multi-billion dollar lawsuit is of an entirely different dimension and must be separately disclosed. This is especially so where, as here, McCutchen had knowledge that Cal Can would bring suit against Bank of America.

The present case does not present the fully informed consent at issue in *Jelco. See* 646 F.2d at 1345–46. Even taking into account the sophistication of Bank of America's attorneys, their informal consent to McCutchen's representing Cal Can as Debtor-in-Possession cannot be considered consent to McCutchen representing Cal Can in the Funding Proceedings.

Having failed to obtain the informed consent of Bank of America to its participation in the suit against the bank, McCutchen should have advised Cal Can to retain special counsel to develop the scheme for funding the Cal Can Action and to obtain court approval for that scheme. As noted above, such an approach would have been entirely consistent with the manner in which complex bankruptcy cases are customarily handled. The general bankruptcy counsel for a Debtor-in-Possession frequently hires special counsel to handle tax problems, litigation, and other matters related to the bankruptcy case. Although any special counsel must spend at least some time fa-miliarizing itself with facts the general bankruptcy counsel already knows, duplication of effort would have been at a minimum in this case. The funding scheme contemplated paying the lenders solely from the proceeds of the litigation; special counsel would need no knowledge of the Debtor's financial affairs in general.

I emphasize that I do not hold in this case that an attorney may not represent a debtor-in-possession where it has an existing attorney-client relationship with one of the debtor's creditors. I decide only, on the specific facts of this case, that the disclosure McCutchen made to the bank here was not sufficient to permit McCutchen to participate as it did in the Cal Can Action against Bank of America.

## B. Duty to Prior Client

Even if Bank of America is properly considered to have been a prior client of McCutchen after the bank discharged McCutchen, McCutchen still had a duty not to participate in the Cal Can Action against the bank. Rule 4–101 of the California Rules of Professional Conduct provides:

> A member of the State Bar shall not accept employment adverse to a client or former client, without the informed and written consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client.

The courts have uniformly held in applying analogous rules, that a law firm may not represent a party against a former client in a matter that is substantially related to a matter on which the law firm represented the former client. *See Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980); *NCK Org'n Ltd. v. Bregman,* 542 F.2d 128, 132 (2d Cir.1976); *Haagen Dazs Co., Inc. v. Perche No! Gelato, Inc.,* 639 F.Supp. 282, 285–86 (N.D.Cal.1986); *Developments, supra,* at 1317–18; Model Rules, *supra,* Rule 1.9 at 109–10. The basis of this rule is to prevent a law firm from using confidential information obtained from the former client in the earlier representation against that client in

the second representation. *Trone,* 621 F.2d at 998–1001; *Developments, supra,* at 1316–17.

The Cal Can Action against Bank of America is substantially related to the Lines and Gregori Actions, in which McCutchen defended the bank. Actions are substantially related if they involve similar legal issues and similar factual evidence. *See Trone,* 621 F.2d at 999–1000; *Developments, supra,* at 1323–25; Hazard, *supra,* at 176. The issues and evidence need not be identical. *See Trone,* 621 F.2d at 1000. The Cal Can Action is substantially similar to the Lines and Gregori Actions in that all involve alleged wrongful lending practices by Bank of America toward California agricultural borrowers. Thus, all these actions will raise similar issues and may require examination of the same bank officers as witnesses regarding the bank's agricultural lending practices. Moreover, in actions of this type, access to the "business thinking" of the banks regarding its lending practices is particularly important. *Cf. Haagen-Dazs,* 639 F.Supp. at 286 ("business thinking" important in antitrust litigation).

Bank of America need not demonstrate that the McCutchen attorneys working on the Lines and Gregori Actions gave information to the McCutchen attorneys working on the Cal Can Action. It is presumed that client information available to one member of a firm is available to all other members of the firm. *See Trone,* 621 F.2d at 999; *Developments, supra,* at 1318–19, 1328–30, 1361–63; Model Rules, *supra,* Rule 1.9 at 111. This presumption is based on the duty of the McCutchen attorneys representing Cal Can to get all information helpful to their client, which puts those attorneys under unwholesome pressure to use information they might acquire either accidently or deliberately from the Lines and Gregori files or from the attorneys who worked on those actions. *See Developments, supra,* at 1361–62; Hazard, *supra,* at 122. It is also noteworthy that McCutchen did not even attempt to create a "Chinese wall" between the attorneys working on the Lines and Gregori Actions and those working on the Cal Can bankruptcy.

The cases cited by McCutchen for the proposition that there is no presumption that McCutchen transferred information to Cappello and Casazza[5] are not relevant here.[6] The question at this stage of analysis is whether McCutchen was prohibited from participating in the Cal Can Action. Part II of this opinion addresses whether any basis exists to disqualify Cappello and Casazza.

Whether Bank of America was a present client or a former client of McCutchen during the Funding Proceedings does not alter the conclusions in Part IA that McCutchen's representation of Cal Can in those proceedings was adverse to the bank and that the bank did not consent to such representation. Thus, having concluded that the Cal Can Action is substantially related to the Lines and Gregori Actions, I conclude that even if Bank of America must be considered to have been a former client of McCutchen during the Funding Proceedings, McCutchen breached Rule 4–101 of the California Rules of Professional Conduct.

**5.** *See, e.g., Panduit Corp. v. All States Plastic Mfg. Co., Inc.,* 744 F.2d 1564 (Fed.Cir.1984); *Akerly v. Red Barn System, Inc.,* 551 F.2d 539 (3d Cir.1977); *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125 (5th Cir.1971); *Haagen Dazs Co., Inc. v. Perche No! Gelato, Inc.,* 639 F.Supp. 282 (N.D.Cal.1986).

**6.** I also note that the rules and court decisions relaxing the rules of vicarious disqualification for attorneys who move into or out of government service or between law firms are not applicable here. *See NCK,* 542 F.2d at 133 n. 7. If the standard rule disqualifying all members of a firm where any member has a conflict were strictly applied with respect to such persons, all attorneys of a firm or agency would be disqualified from a suit because someone in one attorney's *former* firm or agency represented the opposing party in a matter substantially related to the present suit. *See* H. Liebman, *The Changing Law of Disqualification: The Role of Presumption and Policy,* 73 Nw. U.L.Rev. 996, 1004–17 (1979). Thus, strict enforcement of the vicarious disqualification rules would severely restrict attorneys' mobility and make it difficult to attract qualified attorneys to government service. *Id.; Developments, supra,* at 1356–67. No such considerations are applicable here.

## C. Disqualification of McCutchen

Bank of America did not formally move to disqualify McCutchen from participation in the Cal Can Action. Counsel for the bank did state that as a practical matter a decision holding that McCutchen had breached its duty toward the bank and disqualifying Cappello and Casazza would prevent McCutchen from participating further in the Cal Can Action. Bank of America does not argue that McCutchen is disqualified in any sense from representing Cal Can in bankruptcy proceedings that are not contested by the bank.

■ This court may disqualify counsel on its own motion where sufficient grounds exist. *See e.g., Government of India v. Cook Indus., Inc.,* 422 F.Supp. 1057, 1059–60 n. 4 (S.D.N.Y.1976); *In re Porter,* 52 B.R. 692, 699 (Bankr.E.D.Va.1985). Such action is appropriate here to clarify what McCutchen may and may not do. Therefore, I order that McCutchen shall be disqualified from any further participation in the Cal Can Action except to recommend new counsel and to transfer the matter to that counsel.

## II

## DISQUALIFICATION OF CAPPELLO AND CASAZZA

That McCutchen violated an ethical duty toward Bank of America does not by itself justify the disqualification of Cappello and Casazza. Ordinarily, a new attorney to whom a matter is referred when the original attorney discovers a conflict is not disqualified on the basis of the original counsel's conflict. *See, Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 235 (2d Cir.1977); *Aekerly v. Red Barn System, Inc.,* 551 F.2d 539, 543 (3d Cir.1977); *In re Airport Car Rental Antitrust Litigation,* 470 F.Supp. 495, 501 (N.D.Cal.1979).

■ Bank of America contends that the attorney to whom the matter is referred must be disqualified where either: (1) there is a substantial likelihood that the second attorney will receive confidential information regarding the client from the original attorney; or (2) the second attorney participates in a breach of ethical duty by the original attorney. The bank further contends that both grounds exist here to disqualify Cappello and Casazza. I do not address whether there is a substantial likelihood that McCutchen passed confidential information to Cappello and Casazza. I conclude that participation in McCutchen's breach is itself a legally sufficient basis to disqualify Cappello and Casazza, and I find that those firms did knowingly participate in McCutchen's breach.

That a newly retained attorney may be disqualified for participating in the original attorney's breach of duty is established by *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 233 (2d Cir.1977). In that case Morgan, Lewis and Bockius (Morgan) agreed to represent Fund of Funds (FOF) in a federal securities action against numerous defendants. Arthur Andersen & Co. was a possible additional defendant, because it had certified FOF's financial statements. Morgan, as regional counsel for Arthur Andersen, tried to avoid "making a case" against Arthur Andersen. In the course of its investigation of defendants, however, Morgan collected documents relevant to Arthur Andersen's liability. When FOF decided to sue Arthur Andersen, Morgan referred the matter to Milgrim, Thomajan & Jacobs (Milgrim), a firm with which Morgan had a close relationship. Morgan briefly consulted with Milgrim regarding the drafting of the complaint against Andersen.

The trial court found that Morgan would have been disqualified from bringing an action against Arthur Andersen, because it was a current client of Morgan. The trial court refused to disqualify Milgrim, however, finding that it was highly unlikely that Morgan passed to Milgrim confidential information regarding Arthur Andersen.

The Second Circuit reversed. Although there was no evidence that Milgrim received confidential information regarding Arthur Andersen, the court held that Milgrim must be disqualified because it aided Morgan in violating its duty of loyalty to Arthur Andersen.

348

The issue under Canon 5, simply put, is whether, by permitting Meister to pursue the underlying action, we would be allowing Morgan Lewis to violate by indirection those very strictures it cannot directly contravene....

.  .  .  .  .

... The trusism that the firm of Morgan Lewis would have been disqualified from suing Andersen because it was Andersen's counsel, is of little comfort to Andersen which now finds itself embroiled in litigation resulting from Morgan Lewis's extensive investigation of the natural resource assets scheme. And Robert Meister is the extension of Morgan Lewis's continuing involvement in the underlying action for, as we have earlier stated, Morgan Lewis was instrumental in the choice of Meister and his firm, Milgrim Thomajan, to bring the suit and helpful to Meister in advancing the suit even if, as claimed by Meister, that help was of small significance. Moreover, Meister accepted the retainer from Orr to sue Andersen knowing of the Morgan firm's ethical dilemma. Indeed, his retention as counsel was premised on and resulted from the Morgan firm's incapacity to pursue the claim itself. Armed with that knowledge, and aided in some degree by Morgan Lewis, Meister should not have accepted the retainer.

... given the extra ordinary, *sui generis*, facts underlying this action, the generally stated rule that a 'co-counsel' relationship will not alone warrant disqualification is of little relevance to this case.

*Id.* at 233–35 (emphasis in original. Footnote omitted).

The holding in *Fund of Funds* is supported by the Model Rules of Professional Conduct of the American Bar Association. Rule 8.4 provides in relevant part: "It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, *knowingly assist or induce another to do so,* or do so through the acts of another." (emphasis added).

McCutchen's own expert witness, Professor Geoffry C. Hazard of Yale Law School, did not question the general principle that an attorney may be disqualified solely because he or she participates in another attorney's breach of duty to a client.

If a referring firm (i.e., one in McCutchen's situation) has been aided and abetted in an impermissible conflict of interest by the referee firm, the referee firm may itself be disqualified. That was the situation in *Fund of Funds, Inc. v. Arthur Andersen & Co., supra,* where Morgan, Lewis & Bockius developed a case against its own client (Arthur Andersen) with the aid of the firm of Milgrim, Thomajan & Jacobs. The court held not only that Morgan Lewis should be disqualified for conflict of interest but also that Milgrim, Thomajan "aided and abetted Morgan, Lewis & Bockius's breach of fiduciary duty." 567 F.2d at 227. See also 567 F.2d at 233. In the circumstances presented in *Fund of Funds* that conclusion was in my opinion quite correct.

Declaration of Geoffry C. Hazard at 8.

Although the facts of this case are not identical to those in *Fund of Funds,* they call for the same result. As noted above, McCutchen violated its duty of loyalty toward the bank by representing Cal Can in the Funding Proceedings. I find that Cappello and Casazza participated substantially and knowingly in McCutchen's breach of duty and must be disqualified as a result. In support of this finding, I note the following factors.

First, Cappello and Casazza were well aware of the conflicting nature of McCutchen's representations. Cappello and Casazza knew McCutchen was representing the bank in the Lines and Gregori Actions, because Cappello represented the plaintiffs in some of those actions. Cappello and Casazza also knew McCutchen's representation of Cal Can in the Funding Proceedings was adverse to the interests of Bank of America, because the bank opposed Cal Can in the Funding Proceedings and because the funding scheme was essential to Cal Can's action against the

bank. Facts known to Cappello and Casazza also made clear that McCutchen could not undertake representation hostile to the bank. Even if it was not clear that the bank must continue to be considered a present client of McCutchen, Cappello and Casazza should have known that McCutchen was prohibited from representing Cal Can in the Funding Proceedings. Bank of America was a former client of McCutchen and the Cal Can suit was substantially related to the matter on which McCutchen had represented the bank. Through its representation of plaintiffs in those actions, Cappello knew the Lines and Gregori Actions were based on theories of lender liability similar to those asserted in the Cal Can Action against the bank. Because Cappello, Casazza, and McCutchen appeared together on behalf of Cal Can in the Funding Proceedings, Cappello and Casazza were also aware of the full extent of McCutchen's representation of Cal Can against the Bank in the face of that conflict.

Second, the joint participation of McCutchen and Cappello in the Cal Can Action against the bank was substantial. McCutchen, Cappello and Casazza appeared together at three hearings attempting to get court approval for their plan to raise money to fund the Cal Can Action. Because the bank opposed the funding scheme, the hearings were lengthy and required significant preparation. McCutchen, Cappello and Casazza do not dispute working together closely to develop and obtain court approval for the funding scheme.

Third, Cappello and Casazza continued to participate with McCutchen in the Funding Proceedings long after Bank of America asserted that McCutchen's participation was improper and after the bank moved to disqualify them. Bank of America discharged McCutchen as its counsel in the Lines and Gregori Actions before any of the Funding Proceedings commenced, claiming that McCutchen had violated its duty of loyalty to the bank by participating in the filing of the Cal Can Action. Under these circumstances, Cappello and Casazza should have investigated fully whether McCutchen had a conflict and whether they could properly participate with McCutchen in the Funding Proceedings. Had they investigated, Cappello and Casazza would have learned that McCutchen's representation of Cal Can was improper. They also would have learned that they could not properly participate in and benefit from McCutchen's breach of duty toward its client. *See* Model Rules, *supra*, Rule 8.4(a). Thus, there is little room for Cappello and Casazza to argue that their obligations were not clear and the harsh remedy of disqualification should not be invoked.

Fourth, Cappello and Casazza easily could have avoided participating in McCutchen's ethical breach. Having become aware of McCutchen's conflict in representing Cal Can in the Funding Proceedings, Cappello should have insisted that Cal Can retain special counsel for the Funding Proceedings. As noted in Part IA(3), above, retention of special counsel is a customary device to avoid conflicting representation in bankruptcy cases. It is noteworthy that Cappello retained its own bankruptcy attorney to represent it at the third hearing on funding. Even at that hearing, however, Cappello allowed McCutchen to act as principal counsel for Cal Can in seeking money to pay Cappello and Casazza for suing Bank of America.

## III

### ESTOPPEL

■ Cappello and McCutchen argue that Bank of America should be estopped from seeking disqualification of Cappello and Casazza, because the bank knew McCutchen was representing Cal Can in the bankruptcy. This argument is unpersuasive. First, the bank should not be estopped from disqualifying counsel for undertaking representation adverse to the bank without the informed, written consent of the bank, because there is no evidence that the bank either induced McCutchen to proceed with such representation without informed, written consent or that it concealed the conflict from McCutchen. Sec-

ond, even if the client's mere knowledge of the conflict is a basis for estoppel, that standard is not met here. Bank of America did not have full knowledge of the conflict, because the bank attorney who engaged McCutchen to represent the bank in the Lines and Gregori Actions did not know that McCutchen intended to participate in Cal Can's action against the bank. That bank attorney knew only that McCutchen intended to serve as bankruptcy counsel for Cal Can. As noted previously, the conflict between Bank of America and Cal Can in the present suit is of an entirely different dimension than the general conflict between the bank and Cal Can as creditor and debtor in the bankruptcy proceedings.

## CONCLUSION

Disqualification is a harsh and disfavored remedy, because it denies the client the counsel of its choice and because motions to disqualify are often used as a tactical device. *See Developments, supra,* at 1471–73; *In re Airport Car Rental Antitrust Litigation,* 470 F.Supp. 495, 503 (N.D.Cal.1979). This harsh remedy is appropriate, however, in this case. After Cappello brought various lender's liability actions against Bank of America, after the bank hired McCutchen to represent it in some of those actions, and after the bank lost a verdict for $37 million to Cappello in one of those actions, McCutchen participated with Cappello and Casazza in a lender's liability action seeking $1.6 billion damages from the bank. Cappello and Casazza persisted in working with McCutchen on the action after knowing the facts giving rise to McCutchen's conflict and after the bank had objected to the conflicting representation. These acts of McCutchen, Cappello, and Casazza clearly violate the California Rules of Professional Conduct. Disqualification of the three firms is necessary to vindicate those rules and to preserve Bank of America's legitimate expectation of its attorney's loyalty.